757 So.2d 98 (2000)
Danyele MANNINA
v.
WAL-MART STORES, INC. and National Union Fire Insurance Company of Pittsburgh, PA.
No. 99-CA-1102.
Court of Appeal of Louisiana, Fifth Circuit.
February 29, 2000.
Writ Denied June 2, 2000.
*99 Thomas M. Discon, John G. Discon, Gregory T. Discon, Mandeville, Louisiana, Counsel for Plaintiff-appellee/Cross-appellant Danyele L. Mannina.
Frederick R. Campbell, Geoffrey J. Orr, Campbell, McCranie, Sistrunk, Anzelmo & Hardy, Metairie, Louisiana, Counsel for Defendants-appellants.
Court composed of Judges EDWARD A. DUFRESNE, Jr., THOMAS F. DALEY and CLARENCE E. McMANUS.
*100 McMANUS, Judge.
The matter before us is an appeal from a judgment holding a store liable in a "falling merchandise" case. Because we agree that plaintiff carried her burden to show negligence, we affirm. Further, because we find no abuse of discretion in the award of general damages, we affirm this portion of the judgment, appealed by plaintiff, as well.
The incident occurred on October 24th, 1996, while plaintiff, Danyele Mannina, was shopping at defendant-appellant, Wal-Mart's, Harahan location. Mannina sustained injuries when several wood clocks fell from a display rack and struck the back of her head; these injuries required some months of treatment. Suit was timely filed against Wal-Mart, and on May 17th, 1999, a bench trial was held to decide liability and damages. At the conclusion of trial, the judge ruled in Mannina's favor; a written judgment was signed June 11th, 1999, awarding Mannina stipulated special damages and the sum of $8,500.00 in general damages. Wal-Mart's Petition for Appeal was filed July 9th, 1999, and Mannina's answer to the appeal was filed October 18th, 1999.
On appeal, Wal-Mart assigns one error, which is, that the trial court was manifestly erroneous in finding negligence on their part. Mannina assigns as error an inadequate award for general damages.
The following evidence regarding the facts of the accident and negligence on Wal-Mart's part was produced at trial.
Mannina testified that on the evening the accident occurred, she had been at the Wal-Mart, accompanied by her friend, Christine Gilson, shopping for needlepoint kits. The two had been in the crafts department walking down the aisle where the kits were on display when they had stopped to look at some hanging near the bottom of what they describe as a "gondola." On the gondola above the needlepoint kits had been several rows of wood clocks, dangling from "snap peg hooks" bracketed to the metal grid-type frame of the gondola. Mannina testified that as she had been kneeling in front of the needlepoint kits, with Gilson standing behind her, three clocks and the hook from which they had been hanging fell, two of them striking the back of her head: "I heard a noise, Christine heard a noise, she backed up and then noticed that there was (sic) three clocks falling with a peg. She reacted as fast as she could and grabbed the peg and the last clock, but the other two struck me." She testified that she had noticed the clocks as the two approached the gondola, and that there hadn't seemed to be anything "out of the ordinary" about them. She also testified that neither she nor Christine had had any reason to examine the clocks and that neither had touched them. She stated that she did not know what had caused the hook and clocks to fall.
Christine Gilson also testified that she had not touched the clocks, and stated that she had not consciously realized that the objects were clocks until they fell and she caught one. She testified that she had noticed a "rustling" sound, seen a flash, and looked up in time to catch one of the clocks still attached, "holding onto," the snap peg. Though she testified that she had no idea what had caused the clocks to fall, she did state that they had begun to fall as Mannina tried to pull a needlepoint kit from the bottom of the gondola. She, too, testified that she had not seen anything "odd" about the display or the clocks.
Both Mannina and Gilson testified, without equivocation, that there had been no onenot another customer nor any Wal-Mart employeenear them for as long as they had been on the aisle.
Terri Smith, a former Wal-Mart employee, and the one who had been the first to investigate the accident, testified as follows. Though she had ordinarily been the sales floor associate in the domestic section of the store, on the night in question and at the time of the accident, she had been watching the craft section for *101 another worker who had been at lunch for an hour. She stated that at the time of the accident, she had been about twenty to thirty feet from the gondola. She had not actually witnessed the clocks falling, but had been alerted by the noise they made as they fell. After she had turned towards the noise, she had seen Gilson standing, Mannina "stooping," and the clocks on the floor. She testified that she had inspected the clocks, the hook and the gondola, had not seen "anything wrong" with any of them, and had ultimately attached the hook back to the gondola and hung the clocks from it.
Smith also testified that she was familiar with both the metal gondola and the type of hook from which the clocks had been hanging. She described the hook as being identical to, though a little longer than, one admitted into evidence during her testimony. In addition, she described how the hook is attached to the frame of the gondola: "You have to put the top portion on first over the hook and then slide the bottom over, under ... You take it, you put the top portion on first cause (sic) it fits and then you slide the bottom portion underneath, it will fit between two metal pieces, it's like two metal bars." If we may elaborate, the "top portion" of the hook is the top of a small metal plate which is rounded to hug one of the metal rods forming the gondola and which, when rotated around the rod, allows the "bottom portion" of the plate, which is also slightly rounded, to slide underneath a lower rod of the frame. The hook is thus secured to the frame, and the rods from which merchandise is hung, attached to the metal plate, project outwards from the frame. Smith testified that "in her experience" she had never seen a peg hook "of [this] type" fall off of a display rack, and stated that in her opinion, it takes "the actions of someone" to remove such a hook from its place.
Smith was the only Wal-Mart employee to testify regarding Wal-Mart's procedures for aisle inspection and clean-up. She testified that Wal-Mart utilizes a "zone defense" clean-up strategy to maintain the aisles in a clean and safe state, which she described as follows. The defense is "To make sure nothing was on the floor or nothing could fall and hurt anyone, to make sure that the area was neat or orderly, everything pulled to the front." She testified, however, that this inspection was "basically" a visual one only and that it did not entail making sure that every display was "secure." She testified, since she had been watching the crafts department only during someone else's lunch hour, that she could not remember having done the visual inspection of this department during the hour or having specifically looked at the display where the clocks were hung. Smith did not know whether the Wal-Mart employee who was in charge of the craft department had done an inspection recently before the accident.
Smith did not testify, nor did any other Wal-Mart employee, regarding the assembly of the gondola, the placing of the hooks on the gondola's frame, or the hanging of the clocks on the hooks, or to indicate whether these tasks are performed under safety standards designed with store patrons in mind.
At the conclusion of trial, in rendering judgment, the trial judge stated the following oral reasons:
"In view of the testimony offered I am persuaded that the plaintiff was not negligent. I am also persuaded that there is no inference of negligence on the parts of any other party, excepting the defendant.
"In this particular instance, while we have testimony as to the effort it takes to firmly fasten the peg hook into place, I am also aware through not only personal experience, but I notice by her testimony that it would take an equal amount of effort to make sure that one is securely in place.
"There was no testimony to indicate that customers do not from time to time remove these things because they have difficulty or for that reason they don't know *102 how to get a particular clock or any other appliance off a peg hook.
"Under the circumstances, it is the finding of this Court that the inference of negligence here is on the part of the defendant, as they were responsible for the injuries caused to the plaintiff."
The trial judge, therefore, made the following findings of fact: that Mannina was not at fault, that it takes a certain amount of effort to place the hook on a display rack, and that the hook in question could be, and possibly had been, tampered with, "removed," by another Wal-Mart customer.
As Wal-Mart's only assignment of error, they assert that the trial judge was not correct in finding negligence on their part. Wal-Mart argues that it was "physically impossible" for the snugly fitting hook to have been partly dislodged from the frame of the gondola to fall in stops and starts. They suggest that once the hook had been even slightly disengaged, under the weight of the merchandise and subject to the pull of gravity, the hook and merchandise would have fallen immediately to the floor. Wal-Mart further argues that since it is physically impossible for the clock to have fallen without human intervention, and since Mannina and Gilson had been the only persons near the clocks when the clocks fell, the inference is that it had been they who dislodged the hooks. Wal-Mart suggests that the two are lying when they deny having touched the clocks. Having reviewed the record before us, we cannot agree with Wal-Mart's first assertion. And being a reviewing court, though we agree that someone touched the hook, we cannot disturb the trial court's rejection of the second.
A merchant's duty to keep customers safe from harm caused by stray or falling merchandise is set out, in rules that refine the more general tort liability law, under LSA-R.S. 9:2800.6 and cases following the article. The provisions of LSA-R.S. 9:2800.6 regarding falling merchandise read as follows:
A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.[1]
This duty encompasses the responsibility on the part of store employees to place the merchandise safely on the shelf in such a manner that the merchandise will not fall, as well as to replace safely on the shelf such merchandise as has been moved or removed. The employees have the additional responsibility to check the shelves periodically to ensure that the merchandise is in a safe position and does not present an unsafe condition. Smith v. Toys "R" Us, Inc., 98-2085, at p. 4 (La.11/30/99), 754 So.2d 209, 213. Put another way, the duty to "check the shelves" requires employees to exercise "... the degree of care which would lead to discovery of most hazards." Matthews v. Schwegmann Giant Supermarkets Inc., 559 So.2d 488 (La.1990) (emphasis supplied); Whitt v. Wal-Mart Stores, Inc., 96-906 (La.App. 5th Cir. 3/12/97), 690 So.2d 1009, 1012.
Once an accident has happened on a merchant's premises, and the matter has proceeded to trial, the burden is on the customer seeking to prove negligence on the part of the merchant for having neglected the above responsibilities. And we are fortunate, in our review of the accident at hand, to be guided by the Supreme Court's very recent clarification of the burden incumbent on such customers, found in *103 the Smith case, cited above.[2] To prevail in a "falling merchandise" case, the customer must now demonstrate that he or she did not cause the merchandise to fall, that another customer in the aisle at that moment did not cause the merchandise to fall, and that the merchant's negligence was the cause of the accident: the customer must show that either a store employee or another customer placed the merchandise in an unsafe position on the shelf or otherwise caused the merchandise to be in such a precarious position that eventually, it does fall. Only when the customer has negated the first two possibilities and demonstrated the last will he or she have proved the existence of an "unreasonably dangerous" condition on the merchant's premises. Smith, 98-2085 at p. 4, 754 So.2d at 212. Formerly, under Matthews and cases following that decision, the customer's burden had been satisfied by simply showing the first two prongs of the abovethat neither the plaintiff customer nor any other nearby customer had caused merchandise to fall from its shelved position. Matthews, 559 So.2d at 488; Whitt, 690 So.2d at 1011-12. Under Matthews, the customer's having ruled out these two possibilities shifted the burden of proof to the merchant, requiring it to show that it used reasonable care to avoid such hazards by means such as periodic cleanup and inspection procedures. Lapeyrouse v. Wal-Mart Stores, Inc., 98-547 (La.App. 5th Cir. 12/16/98), 725 So.2d 61, 63, writ denied, 99-0140 (La.3/12/99), 739 So.2d 209. Now, under Smith, though evidence of adequate inspection and cleanup procedures may yet be part of the merchant's burden to disprove negligence, evidence of the opposite is certainly relevant as part of the customer's burden to prove negligence: plaintiff customer will carry his or her burden if he or she can make a prima facie showing that inadequate or neglected inspection and cleanup procedures left merchandise in such an unstable or precarious position that it falls from its stacked or displayed position to cause injuriesdamagesto him or her. Smith, 98-2085 at p. 5, 754 So.2d at 213. Finally, we note that the burden enunciated in Smith does retain two principles relied on under the former authority: the hazardous condition may still be proved by either direct or circumstantial evidence, and, further, findings of fact regarding such hazardous conditions made at trial level are given manifest error review. Smith, 98-2085 at p. 3, 754 So.2d at 211.
There is no question that Mannina has eliminated the possibility of any negligence on the part of any nearby customer in the aisle when the accident happened. She and Gilson both testified, thus offering direct evidence, that no other person, not another customer nor any Wal-Mart employee, had been in the aisle in the craft department when the clocks fell. Further, both testified positively that neither of them had touched the clocks or caused them to fall. The trial judge found both to be credible; he found no inference of negligence on the part of either. We cannot disturb this finding on appeal. Smith, 98-2085 at p. 3, 754 So.2d at 212.
The evidence regarding Wal-Mart's observance of its duty to keep the aisles in the craft department clean and safe, produced as part of Mannina's case in chief, is as follows.
The only Wal-Mart employee to testify regarding general inspection and clean-up procedures, Terri Smith, testified that such inspections were done visually only, *104 and that employees did not use any other method to insure that merchandise was securely placed on displays or shelves. There was no testimony to indicate whether there was a set schedule for such inspections or how frequently they were done. There were no records of any sort introduced with Smith's testimony. And in addition, even if these practices would pass muster as a sufficient clean-up routine, there was no evidence presented by Wal-Mart that on the night in question the craft department had been given even this cursory inspection. Smith, who had been watching the craft department for the hour while the craft salesperson was lunching, could only testify that this person "would have" done the regular inspection. Nor could Smith remember doing a safety inspection herself while she had been watching the craft departmentshe wasn't "really sure," but "could have done" the aisle check sometime during the hour. This simply is not adequate. The circumstantial evidence clearly implies negligence on Wal-Mart's part.
Wal-Mart introduced no evidence of any sort, direct or circumstantial, to rebut the implication of negligence. No employee testified regarding the assembling of the "gondola" from which the needlepoint kits and clocks were hanging or the placement of the "snap hooks" on the frame of the gondola. Nor was there any testimony regarding inspecting of new displays to insure that they are properly put together. Thus, Wal-Mart presented no evidence that the gondola and hooks had not presented a hazard from the moment they were put up.
Regarding clean-up procedures, the Wal-Mart employee who had been ordinarily assigned to the craft section did not testify, nor did any supervisor who could have confirmed that the sales employee had inspected the aisles where the accident had happened.
Plaintiff has carried her burden to show that on the night in question the craft aisles of the store in question had not been properly policed and cleared of any possible hazards which would cause harm to customers.
We add that we are not convinced by Wal-Mart's arguments that the "laws of physics" would not allow the hook and clocks to gradually slip off of the frame of the gondola. We have examined the hook in question, and viewed the photographs of the gondola frame, and do not agree that the hook could not detach in degrees from the gondola. Nor does, even if true, the fact that human intervention is necessary to move the hook logically eliminate the possibility of the hook's slipping gradually. Further, the testimony of one Wal-Mart employee that she had never seen this happen does not convince us that it could not happen. We repeat, we have examined the hook, and believe that most likely it did get dislodged by another customer perhaps removed and not properly replacedthen slowly fell away from the frame of the display rack. We note, and agree with, the trial judge's observation that customers "from time to time" remove hooks from shelves or displays because sometimes merchandise is difficult to remove from hooks. And at any rate, regarding the weight due appellant's assertions, we must remember that the laws of physics do not resolve the question of legal cause. Jarvis v. J.I. Case Co., 551 So.2d 61, 62 (La.App. 1st Cir.1989).
The hook and gondola in question could have been not properly assembled; the hook could have been dislodged by a customer. The hook could have gradually slipped from the rack. Careful employees, vigilant employees, would have prevented any of this from happening. The trial judge's finding of negligence on Wal-Mart's part was correct.
Turning now to Mannina's error on appeal, we also agree that the trial judge was correct in his assessment of general damages awarded for her injury resulting from the accident.
*105 Mannina testified that two clocks struck her on the back of her head. She stated that immediately after the blow, her vision was blurred, she began to develop a headache, and her neck began to get "stiff." She testified that within ten minutes of the accident her neck began to hurt. Christine Gilson testified that immediately after the accident, Mannina had been so "shaky" that she could hardly stand or walk.
Mannina was treated immediately after the accident at Elmwood Medical Center for scalp contusions and was released with instructions to take over the counter medication as necessary.
Mannina sought medical treatment the day after the accident occurred, and saw Dr. Rhonda Kroll, M.D., and internist, for not quite ten months. On Mannina's first visit, Dr. Kroll noted the presence of spasms in Mannina's cervical spine and tenderness along the occipital area (the back of Mannina's head). Dr. Kroll diagnosed a soft tissue cervical injury, cervical sprain, prescribed headache medication and muscle relaxers, and advised Mannina to not work if she "couldn't handle" the duties. Dr. Kroll noted post-traumatic headaches at Mannina's next visit, on November 1st, 1996, and when Mannina also complained of blurred vision, Dr. Kroll referred her to a neurologist.
Dr. Walter Truax, M.D., a neurologist, saw Mannina at least once, on November 7th, 1996, and ruled out the possibility of any brain injury. Dr. Truax's narrative further indicates that though he "couldn't conceive" that Mannina's visual problems were "real," he recommended her to an ophthalmologist. Though Mannina testified that she saw Dr. Truax on two occasions, Dr. Truax's records do not show as much.
Mannina's next visit with Dr. Kroll was on November 8th, 1996, and at this visit, Dr. Kroll noted that Mannina showed "marked discomfort" when she moved her neck, and when Mannina still complained of "discomfort" at a November 22nd, 1996, visit, Dr. Kroll recommended physical therapy. Mannina continued treating with Dr. Kroll, and at a December 17th, 1997, visit, Dr. Kroll noted the development of increased spasm since the last visit. Mannina was still complaining of headaches in February of 1997, and at an April 28th visit, Mannina complained of pain and a burning sensation, and Dr. Kroll noted that the neck spasms had not abated. At an August visit, Dr. Kroll noted that Mannina was "improved," and at a September 9th, 1997, visit, Dr. Kroll found "no active cervical sprain."
Coincidentally, over the course of treatment for her neck injury, Mannina had been suffering from sinusitis, and had complained of symptoms related to this condition at almost every visit with Dr. Kroll. Regarding Mannina's headaches, Dr. Kroll testified that the sinusitis could have been a contributing factor in their recurring over the course of the neck injury.
Mannina did attend therapy over the course of her treatment with Dr. Kroll at Professional Therapy Services, Inc.. She commenced therapy on November 27th, 1996, and for the first month, went almost three times a week. The frequency of visits had diminished sharply by the next month, but increased again in the month of February of 1997. This pattern repeated itself, with therapy tapering off, then increasing, and by the last month of Mannina's treatment, roughly the beginning of June through the beginning of July 1997, Mannina was going to therapy only once a week.
Mannina herself testified that the therapy at first gave only "temporary" relief, but eventually, as she "kept going back," it helped, and she did begin to feel better. She also testified that by the time she was discharged from Dr. Kroll, she felt "better," though she still had back pain "on occasion," and that her headaches had discontinued.
Dr. Kroll directly related Mannina's injuries and treatment to the accident at Wal-Mart. And though Dr. Kroll did testify *106 that she had advised Mannina to not work over the course of treatment, she did not diagnose any permanent effects from the injury.
In the assessment of damages in cases of offenses and quasi offenses, much discretion must be left to the judge or jury. LSA C.C. art. 2324.1. Absent a determination that the trial court's very great discretion in the award of general damages has been abused in the matter under review, the reviewing court should not disturb the trier's award. Reck v. Stevens, 373 So.2d 498, 501 (La.1979), citing Wilson v. Magee, 367 So.2d 314 (La. 1979). The discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993); Stevenson v. Louisiana Patient's Compensation Fund, 97-709 (La. App. 5th Cir. 4/9/98), 710 So.2d 1178, 1181.
We cannot say that the trial judge abused his "great" discretion in the instant matter. Mannina suffered only a soft tissue injury to her neck which resolved over the course of conservative treatment with no complications and no permanent damages. One of the symptoms resulting from the neck injurythe headacheshad another contributing factor, Mannina's sinusitis. Further, the consulting neurologist seen by Mannina did not find objective evidence to confirm one of Mannina's other complaints, blurred vision. Mannina offered no testimony to show that her injury significantly disrupted her daily routines or activities, or that it otherwise diminished the quality of her life. We understand, of course, that this would have occurred, to a degree. And we are not forgetting that Mannina was unable to work until her injury had resolved. However, we must remember that Mannina was compensated for her lost income as an element of special damages. We have not found anything in this record which would allow us, a reviewing court, to say that the trial judge's award for a roughly ten month soft tissue neck injury, manageable with conservative treatment, and without any other aggravating factors, was not adequate.
For the above reasons, we affirm the trial court's judgment in all respects. Appellants, Wal-Mart Stores, Inc., and National Union Fire Insurance Company of Pittsburgh, Pennsylvania, are to bear all costs of appeal, including those incurred by Danyele Mannina.
AFFIRMED.
DALEY, J., DISSENTS WITH REASONS.
DALEY, J., dissenting.
I respectfully dissent. I find that the plaintiff failed to prove by a preponderance of the evidence that Wal-Mart's negligence caused the accident. I disagree with the trial court's oral reasons for judgment that an inference of negligence meets plaintiff's statutory burden of proof. Negligence must be proved by a preponderance of the evidence; it cannot be inferred by the lack of evidence.
Plaintiff proved that an accident happened, but did not prove by a preponderance of the evidence that it was caused by defendant's negligence. Plaintiff and her witness only showed that the hook fell. Neither knew how or why the hook fell. The Wal-Mart witness testified that the hook and display looked normal and that she replaced the hook and the merchandise. There was no showing that Wal-Mart was negligent. This is not a res ipsa situation. We cannot assume that just because the hook fell, the defendant was negligent.
A look at the picture of the display and an examination of the hook which was entered into evidence supports the conclusion that to fall, the hook needed to dislodged by someone. The trial court recognized through its own experience that customers sometimes dislodge display hooks when removing merchandise and *107 that they do not always properly re-fasten the hooks. Plaintiff and her friend testified that neither of them touched the clocks or the hook the clocks were on prior to the clocks falling. Defendant argues that the plaintiff or her friend must have touched the clocks or they would not have fallen. The evidence established that when the plaintiff removed the needle point kit from the lower hook the upper hook with the clocks on it fell. The inference referred to by the trial court appears to be that a properly fastened hook would not have fallen when plaintiff removed the needle point kit from the lower hook.
The defendant, Wal-Mart does have a duty to safely display its merchandise. I cannot infer negligence because in this case Wal-Mart did not identify some policy of checking all of the hooks on every display in every aisle on a routine basis. I find that the plaintiff did not meet the burden of proof required. See Jupiter v. Family Dollar Stores of Louisiana, Inc., 99-414 (La.App. 5 Cir. 9/28/99), 742 So.2d 1065.
I, therefore, would reverse the trial court finding.
NOTES
[1] We note that the more stringent burden under LSA-R.S. 9:2800.6B is applicable only in situations where a customer falls on a merchant's premises. Smith v. Toys "R" Us, Inc., 98-2085, at p. 5, 754 So.2d 209, 212, footnote 2 (La.11/30/99); Davis v. Wal-Mart Stores, Inc., 99-723 (La.App. 5th Cir. 1/12/00), 751 So.2d 357.
[2] The Smith case was decided while the instant matter was on appeal, and it is "axiomatic" that changes in law brought about by judicial decision will be given effect in judgments on direct appeal. Guillie v. Marine Towing, Inc., 95-355 (La.App. 5th Cir. 2/14/96), 670 So.2d 1298, 1304. In the instant matter, the Petition for Appeal (as appellant styled it) was signed July 9th, 1999; the Smith case was decided November 30th, 1999. It is therefore binding here. We note also that generally, laws affecting various burdens of proof are procedural and may be applied retroactively. Sudwischer v. Estate of Hoffpauir, 97-0785 (La.12/12/97), 705 So.2d 724, 729.