807 So.2d 1114 (2002)
Daniel M. HEBERT and Jerri Hebert
v.
OLD REPUBLIC INSURANCE COMPANY, et al.
No. 01-CA-355.
Court of Appeal of Louisiana, Fifth Circuit.
January 29, 2002.
*1117 Wayne M. LeBlanc, Metairie, LA, Counsel for plaintiffs-appellants.
R. Henry Sarpy, Jr., Gregory D. Latham, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, Counsel for defendants-appellees-cross-appellants.
Court composed of Judges JAMES L. CANNELLA, SUSAN M. CHEHARDY and CLARENCE E. McMANUS.
CLARENCE E. McMANUS, Judge.
In this matter, we affirm a judgment allocating percentages of fault in an automobile accident among Plaintiff-Appellant Daniel M. Hebert and various Defendants, one of whom has answered the appeal; we also affirm all awards of damages.

STATEMENT OF THE CASE
The instant matter arises out of a collision between a truck being driven by Hebert and a tractor-trailer backing out of a car dealership. Suit was filed on September 10, 1997, in Civil District Court for the Parish of Orleans. The suit named as Plaintiffs Daniel M. Hebert and Jerri Hebert. Named Defendants were Old Republic Insurance Company, Commercial Carriers, Inc., Charles Parker, Government Employees Insurance Company, and Saturn of New Orleans, Inc., D/B/A Saturn of Metairie.
An Answer and Cross Claim was filed by Old Republic in the proceedings in Civil District Court; made Defendant in the cross claim was Saturn of New Orleans.
On August 22, 1997, a Joint Motion and Order to Transfer was granted, and the matter was transferred to the 24th Judicial District Court for the Parish of Jefferson.
On February 4, 1998, Defendant Government Employees Insurance Company was dismissed from the suit.
On September 27, 1999, a First Supplemental and Amended Petition for Damages was filed, adding as Defendant Landmark America Insurance, an insurer of Saturn. On January 18, 2000, a Second Supplemental and Amended Petition for Damages added Ryan Sharpe as a Defendant.
All answers were filed into the record, and a jury trial was held July 31 through August 3, 2000. At the beginning of these proceedings, a judgment was signed dismissing Saturn and Landmark. At the conclusion of trial, the jury completed written interrogatories; a written judgment was signed on August 29, 2000, incorporating the findings made by the jury.
At proceedings held October 13, 2000, Hebert's Motion for Judgment Notwithstanding the Verdict, or in the Alternative, for a New Trial, was denied, and Defendant Parker's Motion for Judgment Notwithstanding the Verdict was dismissed as untimely. In addition, at this hearing, the trial judge awarded various costs in favor of Hebert.
Hebert timely filed a Motion for Appeal; Parker filed an Answer to the Appeal.
Hebert now raises the following errors:[1]
1. The jury is clearly wrong in holding Plaintiff 45% at fault in an accident where Plaintiff is proceeding on a favored *1118 street, observing a stalled vehicle and a pedestrian on his left, when an empty car carrier enters Causeway Boulevard on his right;
2. The jury is clearly wrong in assigning any fault to Plaintiff that may have inferred that Plaintiff was on the cell phone at the time of the accident or that Plaintiff was at fault for not seeing and avoiding the empty trailer;
3. The jury is clearly wrong in assessing fault to a backing tractor-trailer rig at only 15% when the tractor-trailer driver had a legal duty, per La. R.S. 32:124 not to back out onto a roadway, in fact, has a duty to yield to all approaching vehicles so close as to constitute a hazard;
4. The jury is clearly wrong in assessing 40% negligence against the Saturn employee who was following instructions given to him by the Defendant truck driver, Parker;
5. The jury is clearly wrong in relying on the conflicting and contradictory testimony of Sharpe and Parker in arriving at any conclusions as to Hebert's fault;
6. The jury erred in its determinations of fault among the parties in its failure to do a duty risk analysis;
7. The trial judge was wrong in failing to give a mental impairment-disability element of damages in the Verdict Form;
8. The jury is clearly wrong in awarding damages of only $50,000.00 for pain, suffering and mental anguish for a plaintiff that has orthopedic injuries, permanent headaches, severe anxiety, irritability, change in personality and is impatient and insecure about his career and has been affected in every aspect of his life considering the jury made an award of $28,000.00 for future medicals;
9. The jury is clearly wrong in failing to award Plaintiff any damages for lost wages or loss of earning capacity.
Defendant Old Republic, by way of their answer to the appeal, raise the following errors:
G. The Court Erred in Allowing Duplicative Recovery for Hedonic Damages and Pain and Suffering;
H. The Award of $60,000.00 for Loss of Consortium to Mrs. Hebert is Erroneous;
I. The Court erred in Allocating Costs and Expert Fees against Appellees, first, as to Court Costs, and second, as to Expert Fees.

FACTS
As noted, this matter arises out of an automobile collision; the accident occurred on November 1, 1996. The accident occurred in front of Saturn's sales lot, located on the southbound lanes of Causeway Boulevard. At the time of the accident, Appellant Daniel M. Hebert was driving his Toyota pickup truck; Daniel suffered various injuries in the accident. Jerri Hebert is Daniel's wife, and her claims are for loss of consortium. The accident occurred as Defendant Charles Parker was backing a truck with an attached trailer out of Defendant Saturn's lot onto Causeway. Parker was employed by Defendant Commercial Carriers, Inc., who is (or, was) insured by Old Republic Insurance Company. Parker's own auto insurer at the time of the accident was Government Employees Insurance Company. Saturn was named as a Defendant based on allegations of negligence on the part of Defendant Ryan Sharpe, who, when the accident occurred, was directing Parker out of the lot and onto Causeway, and based on allegations that Sharpe had not been properly trained to perform this task. Saturn is *1119 (or, was) insured by Defendant Landmark America Insurance Company.
The record contains the following facts regarding the accident itself.
Ryan Sharpe testified that as of the date of the accident, he had been working at Saturn since August of 1996. Part of his responsibilities had been to help unload new vehicles from truck-trailers making deliveries. It had been part of his job, once the trailers were empty, to help the drivers back out of the lot back onto the street. Sharpe testified that he had received no special training from Saturn regarding how best to direct the trailers out of the lot. Saturn had used two employees to perform this task, when this was possible. Sharpe also stated that he had guided trailers out of the lot "quite a few times," without incident, and that he "pretty much" had done it the same way on each occasion.
Sharpe testified that he had been instructed to use a brightly colored, or reflective, vest only when he was directing the trailers at night.
Sharpe testified that it would not been possible for Parker to turn the trailer around on Saturn's lot, thus allowing Parker to head onto Causewaythe parked cars, the cars for sale, cover almost the entire lot.
Before he started to motion Parker out of the lot, Sharpe and Parker had discussed what hand signals he would use to direct Parker.
Sharpe testified that Parker had pulled the trailer to the edge of the curb, stopped, and waited for Sharpe to signal. Sharpe testified that he waited for a traffic signal located some distance from the lot to stop traffic on Causeway before signaling to Parker. He stated that there were no cars approaching the Saturn lot in the two lanes closest to the sidewalk; a vehicle approaching in the median lane stopped in response to his hand signal. Sharpe testified that he stood in front of the stopped vehicle, turned towards Parker, and motioned Parker to commence backing out. Sharpe remembers that Parker began to back the trailer out of the driveway at approximately two to three miles per hour.
Sharpe's testimony regarding when he first saw Hebert's vehicle is equivocal. He first testified that he had not seen Hebert until immediately before Hebert collided with the trailer. However, he then acknowledged a statement made during a deposition in which he stated that he had seen Hebert when Hebert was a car length to a car length and a half away from the moving trailer. He repeated this last statement again during testimony. In addition, Sharpe testified that Hebert had been in the sidewalk lane when he first saw the vehicle.
He testified that the impact between the trailer and Hebert's vehicle took place in the center lane of traffic. He had been two to three feet away from the impact, probably directly between the stopped car and the impact.
Sharpe also testified that he had seen Hebert using a car phone immediately before and immediately after the impact.
Finally, he testified that it seemed to him that Hebert had made an attempt to pull around the trailer in an attempt to avoid the collision; there hadn't been enough room between the back of the trailer and the stopped vehicle for Hebert to pull in between.
Parker's testimony was introduced into the record by way of deposition, parts of which were read for the jury. At the time of the accident, Parker had been a truck driver "on and off" for thirty years. He had delivered cars to the Saturn dealership on occasions before the day in question, and he confirmed Sharpe's testimony *1120 that it would have been impossible for him to turn his trailer around on the lot to avoid backing out onto Causeway Boulevard. In addition, he testified that in his experience a single individual is sufficient to control traffic during a backing maneuver, though he did state that he had seen flags and vests used in similar situations.
He testified that as he was backing out, the trailer's 4-way flashers had been activated, in addition to an alarma loud beeping noise.
Parker testified that he had only been able to watch for Sharpe's signals in the passenger side rear-view mirror. He testified that in the mirror he could see Sharpe standing in front of the bumper of the stopped car. He also testified that he thought the car had been stopped for about two minutes before he began to move the trailer.
He testified that once Sharpe signaled, he began to back up very slowly. The collision occurred when the trailer was half way between the sidewalk and the median.
Parker testified that he had not seen Hebert's vehicle at any time before the impact, since it was not visible in the rearview mirror. And finally, he testified that during the backing-up process, he would have been relying on Sharpe's direction "100%," that Sharpe had been his only "eyes."
Plaintiff, Daniel Hebert, testified that on the morning of the accident, he had been making a business call at an office located on the northbound lanes of Causeway Boulevard. He testified that as he left this address, he made a u-turn almost as soon as he pulled onto Causeway Boulevard. He exited the u-turn into the southbound lanes of Causeway Boulevard in the lane nearest to the median. He doesn't remember how long he had been in the southbound lanes before he spotted the vehicle Sharpe had stopped.
He testified that when he spotted Sharpe, Sharpe "appeared to be .... waiving me to come around" the stopped vehicle. He testified that he immediately attempted to pull around the vehicle. He stated that when he attempted to move from the median lane to the middle lane, as he first started to move, the middle lane had been clear of any obstruction. However, as he entered the middle lane, and after he had been in the middle lane for only "a moment," he collided with the trailer.
Hebert testified that he had not been talking on his cell phone when the accident occurred.
Paul Schubert was qualified as an expert in the field of accident reconstruction, and testified as follows. Schubert found several contributing factors at play in the accident, most significantly, Sharpe's lack of control over oncoming traffic. Schubert testified that Saturn should have employed two individuals to accomplish Parker's exitone to signal Parker, and one to stop traffic. Schubert expressed the opinion that the accident had occurred because Hebert had not been given adequate warning that Parker would suddenly pull into his path. In addition, Schubert stated that the cars on the Saturn lot and several utility poles would have "camouflaged" the moving trailer, making it difficult for Hebert to see.
Schubert also testified that while Parker had been depending on Sharpe's directions, Parker should have made sure that Sharpe had been wearing some sort of bright vest to direct traffic.
Finally, Schubert acknowledged that other traffic (the single stopped car) on Causeway Boulevard. had managed to stop under Sharpe's direction, and he admitted that Hebert should have seen the "18 wheeler" "in [his] way."
*1121 Mottie McClary, qualified as an expert in accident reconstruction, testified that one individual should have been adequate to signal oncoming traffic. Further, he testified that vests or flags would not have been afforded any more "respect" than the single individual without the bright or reflective vest. McClary testified that the trailer had been in the street for a minimum of seven seconds, and perhaps as much as eight seconds, before the collision occurred. And finally, he stated that while Parker's restricted vision left him dependent on Sharpe for help backing out of the lot, Parker is the "captain of the truck," responsible for everything that happens to the truck and trailer.
Dr. Don C. Ivey's expert opinion was introduced into the record by way of his deposition, which was read, in parts, to the jury. Dr. Ivey, who was qualified as an accident reconstruction expert, stated that the theory that reflective vests and bright cones would have made Parker's backing up safer is not supported by research. In addition, he stated that a single individual should have been able to back Parker out of the lot without help. Dr. Ivey disagreed with the proposition that there was anything camouflaging the trailer as it pulled out of the driveway; he stated that the trailer's size, color and shape of the trailer instead made it "eminently visible" to approaching traffic.
The evidence regarding Hebert's injuries is as follows.
Hebert testified that he did not remember his head hitting the steering wheel with the impact, but he identified photographs of the steering wheel that show a definite dent. He testified that he was "shook up" after the accident, that his first memory after the impact is of someone asking him whether he had been hurt. He testified that his head began to hurt "right away."
Jerri Hebert, Daniel's wife, testified that when she arrived at the accident scene, Daniel seemed disoriented; she stated that he also complained of soreness.
Oscar Griffith was qualified as an expert in physics with expertise in calculating the force on the human body in an accident and expertise in the head injury criteria, better known as the HIC values. Griffith stated that based on measurements that factor in the speed of Hebert's truck and the composition of the steering wheel, if Hebert's car had been going at least thirty miles per hour when the impact occurred, there was an 80% chance that Hebert would have suffered a severe head injury. However, Griffith did also state that not all cases, or, actual injuries, conform to values suggested by these calculations.
Hebert was seen in East Jefferson's emergency room immediately after the accident; emergency room records indicate that he had complained of a headache and shoulder pain.
Hebert began to treat with Dr. Warren Bourgeois, M.D., on November 6, 1996. Dr. Bourgeois diagnosed post concussion headaches, a cervical strain a contusion with strain to the left shoulder, and, ultimately, a strained left rotator cuff. Dr. Bourgeois testified that he would consider these to be "mild findings."
He testified that when Hebert was still complaining of headaches on November 18, he referred him to a neurologist, Dr. Wendy Jamison, M.D. On December 5, when Dr. Bourgeois diagnosed the rotator cuff problem, Hebert was given a steroid injection and was prescribed rehabilitative exercises. When Dr. Bourgeois last saw Hebert, on February 27, 1997, he noted a significant improvement to Hebert's shoulder, with minimal discomfort; he noted no complaints of neck pain. Dr. Bourgeois expressed no opinion regarding Hebert's headaches as of this date; as of Hebert's *1122 last visit with Bourgeois, Dr. Jamison had begun to treat Hebert as the primary treating physician for the headaches.
Hebert himself testified that he had never had problems with recurring headaches before the accident. He stated that his head started to hurt immediately after the accident, and that during the first few weeks after the accident, he was suffering with severe headaches three to four times a week. He stated that he was still taking medication for the headaches as of the date of trial. In addition, he stated that the headaches caused disrupted sleep patterns.
Dr. Wendy Jamison, M.D., a neurologist, treated Hebert over the course of several years for his headaches. Dr. Jamison diagnosed post-traumatic headaches and post concussion syndrome. In addition, Dr. Jamison testified that since Hebert's headaches had persisted for over two years after the injury, "most likely" the headaches would be a long term problem, possibly requiring medication for the rest of Hebert's life.
Dr. Susan Andrews, Ph.D., a neuropsychologist who had tested Hebert, testified that his test results were "mildly abnormal"; she testified that Hebert had sustained a closed head injury.
Dr. Leon Weisberg, M.D., a neurologist, performed an independent medical examination of Hebert, and diagnosed a mild post-concussion syndrome, with symptoms that would have resolved over time. Dr. Weisberg testified that while he had no doubt Hebert had headaches resulting from the accident, the headaches were related to soft tissue myofascial pain syndrome, which should have resolved within six weeks after the accident. Weisberg described Hebert's injury as an acceleration-deceleration injury, with injuries to soft tissue only. He found no symptoms due to any structural brain injury secondary to a trauma.
Dr. William Black, Ph.D., a neuropsychologist who did an independent test of Hebert, testified he was "quite certain" that Hebert had suffered no brain injury; he testified that Hebert had not suffered post concussion syndrome. Further, he testified that concussion related headaches do not last as long as Hebert's headaches had persisted, and that 85% of people with mild closed head injuries recover within three months. Finally, Dr. Black testified that Hebert's lingering headaches have some other cause besides post-concussion syndrome, perhaps stress or emotional problems, and that the incorrect diagnosis of post-concussion syndrome is preventing Hebert from seeking the proper treatment to combat the real cause of the headaches.
Testimony was also produced to show that Hebert has been left with a "mental defect" as a result of the accident. Hebert himself testified, and Jerri Hebert confirmed, that since the accident he has been irritable and forgetful. Dr. Adrian Blotner, M.D., a psychiatrist, testified that he had diagnosed a mood disorder, an anxiety disorder and mental impairments resulting from a brain injury, causing a moderate to severe impairment in Hebert's level of functioning. Dr. Blotner testified that treatment has not reversed Hebert's condition, that there is a "largely irreversible" component of the injury, and that without continuing treatment, Hebert's condition would deteriorate.
As far as medical special damages are concerned, it was stipulated at the beginning of trial that Hebert's past medical specials total $12,467.81. Neither Hebert nor Dr. Jamison provided a specific figure for future medicals. However, Mel Wolfson, who was qualified as an expert in the field of economics, estimated that future treatment with Dr. Blotner would total $22,272.00, and estimated that future prescription *1123 expenses would amount to $4,912.00.
The following testimony was produced regarding Daniel's loss of enjoyment of life and Jerri Hebert's loss of consortium.
Hebert testified that since the accident, as noted, he has become forgetful and irritable. In addition, he testified that the pain medication that he takes has several unpleasant side effects, including a loss of sexual function. Jerri Hebert testified that prior to the accident, Hebert had not ever had any problems with moodiness or anxiety, but that these problems manifested themselves after the accident. She testified that since the accident, Daniel frequently argues with their children, and that he is now unable to participate in school-oriented activities with the children. Finally, she testified that since the accident, the family had been unable to take a vacation together.
Regarding her loss of consortium claim, Jerri testified, as noted immediately above, that Daniel is no longer able to participate in school activities with or for their children. Further, she, too, testified that the accident has resulted in lessened intimacy between her and Daniel. She testified that it had been "very difficult" to maintain the relationship she and Daniel had before the accidentshe stated that since the accident, she and Daniel are not able to discuss various matters, that the two have trouble "relating." Finally, she testified that she feels as though she is talking to a "different person."
The testimony regarding Hebert's loss of income and loss of earning capacity is as follows.
Hebert's claims of lost income and lost earning capacity revolve around assertions that because of the accident he has been able to advance from a salary based income to straight commission income. He argues that the straight commission arrangement would generate a higher income.
Hebert is employed by Louisiana Utility Supply as a salesman; the company sells underground utilitiespipes, valves, and other similar products. Hebert testified that since the accident, he has been "extremely frustrated" at work. He stated that his main problem is that he is unable to remember things.
Hebert testified that in 1998 he was offered a choice between remaining at a base salary with some percentage of commission (4½ to 5%), and moving to straight commission income (with 19% commission). He testified that though he remains one of the company's top salesmen, he has hesitated to move to a straight commission salary: "I don't feel like right not I'm in a frame of mind that I can handle this kind of stress .... if I'm blowing up now at work, at little things now, I'm afraid to think of what might happen if I'm on strictly commission and I lose a major order either because I forgot to put a piece of paper work in, forgot to dot an `i' or cross a `t'."
Robert Rogers, the district manager of Louisiana Utility Supply, also testified that Hebert has been having problems at work since the accidentmood swings, memory problems, lack of concentration. He stated that the office has had to make accommodations to allow Hebert to continue to work. This notwithstanding, he testified that Hebert "does a good job," and that he has offered the straight commission position to Hebert "on numerous occasions."
Mel Wolfson, the economist, testified that in the years 1998 and 1999 Hebert had lost income of slightly over $75,000.00 as a result of not accepting a straight commission pay base. In addition, Wolfson estimated that over the remaining course of Hebert's work life, the choice to *1124 not accept the straight commission salary would cost Hebert over $700,000.00.
Kenneth Boudreaux was also qualified as an expert in economics. Boudreaux testified that because Hebert's income had continued to increase between 1996 and 1999, Hebert could not prove a loss of income. Boudreaux testified that even tied to a salary based income, Hebert's income had risen "dramatically" since 1996, from between $33,000.00 and $40,000.00 up until 1996 to approximately $70,000.00 in 1999. Boudreaux testified that he had seen no proof that Hebert had lost any past or future income as a result of the accident. Finally, Boudreaux testified that employees in general must make choices such as the one facing Hebert "all the time."
At the conclusion of the trial, the jury made the following findings. The jury found Charles Parker 15% at fault, Saturn 40% at fault and Daniel Hebert 45% at fault. The jury awarded Hebert $50,000.00 for pain, suffering & mental anguish, past and future; $40,000.00 for medical expenses, past and future; nothing for loss of earnings and earning capacity; and $100,000.00 for loss of enjoyment of life. In addition, the jury awarded Jerri Hebert $60,000.00 for loss of consortium.

ASSIGNMENTS OF ERROR NUMBERS 1, 3, 4 AND 5
In Hebert's assignments of error 1, 3, 4 and 5 (Parker's assignments A, B, C), he argues that the jury was in error in its distribution of faultParker 15%, Saturn 40%, and Hebert 45%.[2] Hebert argues that because Parker violated several traffic regulations, and because Sharpe was following Parker's directions, Parker should have been assessed the greater percentage of fault. In addition, Hebert argues that he should have been found free from fault. Parker argues that the jury erred in finding him negligent to any degree.
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989) (citations omitted). On review, the issue to be resolved is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Lasyone v. Kan. City S. R.R., 00-2628, at 5-6 (La.4/3/01), 786 So.2d 682, 688; Stobart v. State of Louisiana, Through Department of Transportation and Development, 617 So.2d 880, 882. Further, where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell, cited immediately above (our emphasis). See also McCalmont v. Jefferson Parish Sheriff's Office, 99-940, at 5 (La. App. 5 Cir. 1/12/00), 748 So.2d 1286, 1289, writ denied, 00-679 (La.4/20/00), 760 So.2d 1160.
Allocation of fault is a factual determination subject to the manifest error rule. Theriot v. Lasseigne, 93-2661, at 10 (La.7/5/94), 640 So.2d 1305, 1313; Hopstetter v. Nichols, 98-185, at 8 (La.App. 5 Cir. 7/28/98), 716 So.2d 458, 462, writ denied, 98-2288 (La.11/13/98), 731 So.2d 263; Bienvenu v. State Farm Mut. Auto. Ins. Co., 545 So.2d 581, 584 (La.App. 5 Cir.1989).
Hebert is correct to state that the driver entering a highway has a primary or high duty to avoid collisions. These drivers must use every reasonable means *1125 available to ascertain that their entry onto the highway is made in safety, and such drivers are required to keep a lookout for vehicles on the highway and desist from entering until it is apparent to a reasonably prudent person that such can be done in safety. LSA-R.S. 32:124; Corvers v. Acme Truck Lines, 95-925, at 3-4 (La. App. 5 Cir. 4/16/96), 673 So.2d 1088, 1090. However, even a favored driver can still be found contributorily negligent if his substandard conduct contributed to the cause of the accident. Corvers, 95-925 at 4, 673 So.2d at 1090; Battaglia v. Texas Farmers Ins. Co., 98-2607, at 2 (La.App. 4 Cir. 3/31/99), 732 So.2d 119, 121-2, writ denied, 99-1579 (La.9/17/99), 747 So.2d 564.
Parker is correct in stating that Hebert was under a duty, as he was driving on the morning the accident occurred, to drive prudently and to keep control of his vehicle, and to keep a proper lookout for hazards. LSA-R.S. 32:58; Nicholas v. Voiron, 568 So.2d 1139, 1141-2 (La.App. 5 Cir.1990).
The jury was correctly charged with these principles of law, and we find no error in their determination of fault on Saturn's part. Sharpe testified without contradiction that he had received no training whatever to guide him in helping back 18 wheel truck/trailers into oncoming traffic.
We do not see any error in the percentage of fault attributed to Hebert. If we find Saturn at fault because they had not provided a safe system to help these large vehicles merge into traffic, the very size of the vehicle involved weighs heavily in a finding of fault on Hebert's part. Even Hebert's own accident reconstruction expert admitted that Hebert should have seen the 18-wheeler in the road ahead of him. If a motorist fails to see what he should have seen, then the law charges him with having seen what he should have seen, and the court examines his subsequent conduct on the premise that he did see what he should have seen. Sanchez Fernandez v. General Motors Corporation, 491 So.2d 633, 636-7 (La.1986); Severson v. St. Catherine of Sienna Catholic Church, 97-1026, at 5 (La.App. 5 Cir. 2/11/98), 707 So.2d 1026, 1030, writ denied, 98-653 (La.4/24/98), 717 So.2d 1178.
Regarding a determination of Parker's fault, we cannot say that the jury was in error in attributing some fault to him. Though Parker did testify that he was completely dependent on Sharpe as he backed the trailer out of the Saturn lot, Parker also admitted that he had seen protective vests or traffic cones used in similar situations. And given his thirty years' experience driving trucks, we cannot say that it was wrong to find that Parker was not without fault in agreeing to back his vehicle into traffic without these additional safeguards.
All things considered, having reviewed the record thoroughly, we cannot say that the jury erred in its allocation of fault among the three parties.

ASSIGNMENT OF ERROR NUMBER 2
As his second assignment of error, Hebert argues that the jury was in error in attributing fault on his part based on the inference that he was using his cell phone at the time of the accident. Ryan Sharpe testified that he had seen Hebert on the telephone immediately before the accident occurred. Hebert denied this.
The record also shows the following. The closing arguments are not transcribed, so it can't be determined whether any of the closing arguments made mention of this possibility. The jury charges, however, do not include any reference to cell phones or the possibility of liability arising out of Hebert's use of the phone while he was driving, nor do the jury interrogatories *1126 ask for a finding on this one specific issue.
On the record before us, we will not assume that the jury made a finding to Hebert's detriment on this issue. There were no instructions on this specific issue; the jury interrogatories did not require a specific finding. Had this been the only grounds for liability alleged on Hebert's part, it would be difficult indeed to ignore the possibility that the jury did find that Hebert's phone use was a contributing factor in the accident. However, as discussed above, there were other reasons for finding Hebert at fault in the accident. This being so, we will not assume that the jury made any finding whatever on the issue of his phone use, or that this possibility played any part in their findings of fault.

ASSIGNMENT OF ERROR NUMBER 6
In this assignment of error, Hebert argues that the jury "failed to do" a duty/ risk analysis. The record shows no objection on Hebert's part to the instructions as given by the trial judge. As in Hebert's assignment of error number 2, we could not say as much without speculating on how the jury reached their verdict. However, we see no need to so speculate. The jury was correctly charged with duty/risk and comparative fault principles, Hebert made no objection to the instructions as they were given, and we have found no manifest error in their findings. Any assumption that the jury misapplied the correct principles of law would be completely unwarranted.

ASSIGNMENT OF ERROR NUMBER 7
As Hebert's seventh assignment of error, he asserts that the judge was in error in failing to include mental impairment damages as an item on the jury verdict form, thus allowing the jury to award a sum in compensation.
Regarding the alleged error in the form of the verdict sheet, the record shows the following. The interrogatories submitted to the jury did not allow the jury to itemize, and award a sum for, Hebert's claimed "mental defect" damages. The record shows that on February 28, 2000, the trial judge signed an order which required all parties to the suit to file a pre-trial memorandum that was to include suggested jury instructions. Another order that set a pre-trial conference repeated the instruction that parties were to file suggested jury instructions. Hebert's submitted jury charges were filed in July of 2000, and while they do include a jury charge regarding a past, present and future permanent disability, they do not specifically include any requested charges on mental defect damages. Hebert's proposed jury interrogatories would have allowed the jury to award a sum specifically for "partial loss of mental functioning." At the conclusion of trial, after the trial judge had provided all parties with her jury charges and interrogatories, in response to Hebert's attorney's question why the interrogatories did not provide for the award of mental defect damages, the trial judge stated that such damages were not included in the interrogatories because she had not received any such proposed instructions. There was no objection to this ruling.
Though much of the testimony given by the doctors in this matter did discuss the symptoms of such a syndrome, or condition, Hebert's suggested jury charges did not include any that would have identified or isolated this element of damages for the jury's consideration. It was for this reason that the trial judge would not allow the damages to be included in the jury interrogatories, and there was no objection on Hebert's part to this ruling.
*1127 It is well settled that a party cannot claim improper jury charges as error where he fails to timely object to the charges. LSA-C.C.P. art. 1793; Levet v. Calais & Sons, Inc., 514 So.2d 153, 156-7 (La.App. 5 Cir.1987). This rule applies to jury interrogatories. State, Dept. of Transp. and Development v. McMillion Dozer Service, Inc., 93-590, at 3 (La.App. 5 Cir. 5/31/94), 639 So.2d 766, 768; Keith v.Gallioto, 592 So.2d 510, 512 (La.App. 5 Cir.1991).
Therefore, Hebert is unable to now raise this error.

ASSIGNMENT OF ERROR NUMBER 8
In this assignment of error, Hebert argues that the sum awarded for pain and suffering is inadequate.
In the assessment of damages in cases of offenses and quasi offenses, much discretion must be left to the judge or jury. LSA-C.C. art. 2324.1. Absent a determination that the trial court's very great discretion in the award of general damages has been abused in the matter under review, the reviewing court should not disturb the trier's award. Reck v. Stevens, 373 So.2d 498, 501 (La.1979), citing Wilson v. Magee, 367 So.2d 314 (La. 1979). The discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993); Mannina v. Wal-Mart Stores, Inc., 99-1102, at 12 (La.App. 5 Cir. 2/29/00), 757 So.2d 98, 106, writ denied, 00-917 (La.6/2/00), 763 So.2d 597; Stevenson v. Louisiana Patient's Compensation Fund, 97-709, at 3-4 (La.App. 5 Cir. 4/9/98), 710 So.2d 1178, 1181.
We see no abuse of discretion. Though Hebert testified that headaches resulting from the accident lingered as of the date of trial, there was also undisputed evidence that Hebert's other injuryto his shoulder had resolved within three months of the accident. Further, regarding the headaches, both of the independent examiners testified that Hebert's accident related headaches should also have resolved within months of the accident; Dr. Black testified that headaches occurring over a year after the accident would have some other cause than the accident.
Therefore, in the face of only a soft tissue shoulder injury of a few months' duration and the conflicting testimony regarding Hebert's only other symptom, the headaches, we cannot say that the jury abused its discretion in arriving at the figure awarded for pain and suffering.

ASSIGNMENT OF ERROR NUMBER 9
In this assignment of error, Hebert argues that the jury was in error to not award lost income and damages for loss of earning capacity.
While claims for loss of earning capacity are normally the more speculative element of damages of these two, in this matter, the entire amount of damages claimed by Hebert was based on speculation, or, assumption. Here, Hebert's claim for lost income was based not on a figure calculated for time lost from work, as it would be in most cases, but on the assumption that he had been unable to accept a position offering a higher rate of pay as a result of a mental disability caused by injuries related to the accident. Hebert's claim for lost earning capacity is also based on this assumption.
However, Hebert's supervisor testified that even after Hebert's work habits changed after the accident, Hebert remained a good worker, and that he had offered Hebert the higher paying full commission position several times after the accident. And Hebert himself testified that he remained one of his company's top salesmen, even with the disability that *1128 he claims impaired his ability to do his job. There was undisputed evidence that Hebert's income had continued to increase, even on the salary-based lower commission rate, over the years between the accident and the trial.
In awarding damages for lost income and loss of earning capacity, the trier of fact is afforded much discretion. Folse v. Fakouri, 371 So.2d 1120, 1124 (La.1979); Fleming v. Smith, 93-488, at 9 (La.App. 5 Cir. 5/31/94), 638 So.2d 467, 472.
We can't say that the jury abused its discretion in not awarding the lost income damages in this case. As noted, most significantly, Hebert's income had continued to rise steadily, and sharply, even after the accident that he claims disrupted his work habits. Further, we find that the jury did not abuse its discretion in rejecting Hebert's claims that he has suffered a loss in earning capacity as a result of the accident. As noted by one of the economic experts, such choices are an ordinary jobrelated stress, routinely faced by all employees. We find that the jury was not in error to find that Hebert's claims of accident related lost income were of such a speculative nature as to be not compensable.

OLD REPUBLIC'S ASSIGNMENT OF ERROR G
In this assignment of error, Defendant-Appellee Old Republic argues that it was error for the jury to award damages for both pain and suffering and hedonic, or, loss of enjoyment of life, damages.
The jurisprudence recognizes that loss of enjoyment of life is a separate element of compensable general damages which is not necessarily included in an award for general damages. Stevenson, 97-709 at 6, 710 So.2d at 1182.
Hebert clearly supported his claim for such damages; the award is supported in the record.

OLD REPUBLIC'S ASSIGNMENT OF ERROR H
As their assignment of error H, Old Republic asserts that the award to Jerri Hebert for loss of consortium was too high.
We see no abuse of discretion. Jerri testified that Hebert has been a "different person" since the accident. Both Daniel and Jerri testified that he is no longer able to participate in their children's school activities, and both testified that Daniel is irritable and short tempered with the children. Jerri testified that it is now difficult to "relate" to Daniel, and both she and Daniel testified that the couple is not as intimate as they had once been.
The record plainly demonstrates that Jerri's life is changed since the accident, that she is no longer able to depend on as much support from Daniel as he had previously contributed to the marriage and their family. We find no abuse of discretion in the jury's award.

OLD REPUBLIC'S ASSIGNMENT OF ERROR I
In their final assignment of error, Old Republic argues that the trial judge abused her discretion in awarding various court costs in Hebert's favor.
Under LSA-C.C.P.1920, the trial judge may enter any judgment regarding costs that is equitable. The trial judge's ruling is supported by her reasons on the record, and we see no abuse of discretion.
Therefore, for the above reasons, we affirm the trial court judgment in all its aspects. Each party is to bear his own costs of appeal.
AFFIRMED.
NOTES
[1] Plaintiff's errors 1 through 5 urge the substance of Old Republic's assigned errors A through F.
[2] The fault of a non-party (Saturn), is factored in under LSA-C.C. art. 2323.