871 So.2d 618 (2004)
Gloria LOUSTEAU
v.
K-MART CORPORATION.
No. 03-CA-1182.
Court of Appeal of Louisiana, Fifth Circuit.
March 30, 2004.
*619 Kenneth J. Beck, John E. Sudderth, Harvey, LA, for Appellee.
The Truitt Law Firm, Jack E. Truitt, Madisonville, LA, for Appellant.
Panel composed of Judges SOL GOTHARD, MARION F. EDWARDS and SUSAN M. CHEHARDY.
MARION F. EDWARDS, Judge.
Defendant/appellant K-Mart Corporation appeals a judgment of the district court in favor of the plaintiff/appellee Mrs. Gloria Lousteau, awarding her $802,843.89 in damages. For the reasons to follow, we amend the judgment in part, and affirm.
Mrs. Lousteau injured her leg when she slipped in K-Mart's Store No. 4810 on Veterans Highway in Metairie. Suit was timely filed, and the matter was tried to the judge. At the conclusion of trial, the case was submitted and the litigants were instructed to submit post-trial memoranda and proposed judgments. On December 27, 2001, the court entered judgment in favor of K-Mart, dismissing the plaintiff's claims with prejudice, and Notice of Judgment issued. On January 3, 2002, the court, sua sponte, vacated that judgment, noting on the record that the judgment was signed in error. A Notice of Bankruptcy *620 and Automatic Stay was filed by K-Mart on January 28, 2002. On February 7, 2002, the court rendered a second judgment, along with reasons for such, in favor of Mrs. Lousteau, finding liability and awarding her damages. K-Mart appeals on several grounds.
Initially, K-Mart urges that the court erred in vacating the December judgment, correctly urging that amendment or revision of a judgment is limited to correcting errors of calculation or phraseology. La. C.C.P. art. 1951. We are referred to a case in which our Supreme Court found that a judgment signed by the same judge, in similar circumstances, could not be altered, notwithstanding that it was signed in error.[1] That case is distinguishable on its facts. In Bourgeois, the judgment in favor of the defendants was signed on November 6, 2001, with notice issued on November 29, 2001. Plaintiff received the notice and rather than move for new trial, filed for an appeal on January 15, 2002. On that same day, the court issued a second judgment in favor of the plaintiff, and later issued an order stating it had inadvertently signed the first judgment. In that case, unlike the matter before us, the time for granting of a new trial was long past. Under La. C.C.P. art. 1971, a new trial may be granted, upon contradictory motion of any party or by the court on its own motion, to all or any of the parties and on all or part of the issues. C.C.P. art. 1974 grants seven days, exclusive of holidays, in which a new trial may be granted. The recordation of the trial court that it signed the first judgment in error, within the time frame permitted for granting a new trial, persuades us that the January judgment is not invalid as an impermissible amended judgment.
Additionally, the filing of the Notice of Bankruptcy did not preclude the court from merely signing the judgment. 11 U.S.C. § 362.
K-Mart urges that the court erred in imposing liability where there was inadequate proof regarding the amount of time that any hazard may have been on the floor prior to the accident.
Regarding the occurrence of the accident, Mrs. Lousteau testified that on the day that she fell, she went to K-Mart to get a paint brush in order to paint her kitchen cabinets. She was wearing flat shoes with wooden heels. The ladies' department was on the right, past the checkout counters. After entering the store, she was walking straight ahead and her left foot hit "smeary stuff", and she fell. Dr. Juliette Liss, a customer, came over to help her. She was in excruciating pain, and knew she had broken her leg. She saw that what she had slipped on was medium to dark green, about an inch thick, and a foot long in two directions. She did not know what it was, but thought it was something like a piece of lettuce. Mrs. Lousteau did not know how long the substance had been on the floor, and did not see it before she fell. She did not see anyone with ice cream directly in front of her, or in the immediate vicinity.
Jimmy Johnson, loss prevention team manager at K-Mart, testified that his duties are to reduce inventory waste, whether by theft, shoplifting, or other means. He was trained in handling apprehensions, and certified in handling customer accidents. At K-Mart, each employee has the duty to look for potential hazards and clean them up. If they are unable to clean it themselves, they are to stay at the area, and call for someone to take care of it. Johnson did not know if this was a written policy at that particular store, the *621 subject was covered in new employee training. No store log is kept on spills or cleanups unless there was an accident. K-Mart does not require regular or periodic floor safety inspections. There is no designated cleanup crew that checks the store for spills, although a customer could buy food in the deli department and carry it throughout the store. The manager at the Veterans K-Mart, Jabar Smith, was a competent and conscientious employee.
Mr. Johnson was at the store for about two and one-half years, including 1998-1999. A number of accident reports at the subject store for 1998-99 were introduced into evidence. Twenty-six reports from 1998 and twenty-nine from 1999 indicated customer slips on various substances. There were six slip and fall incidents between April 28 and May 28, 1999. It appeared that the accident report on Mrs. Lousteau had not been completely filled out, but the witness felt this was because the manager was trying to assist the injured customer.
Oceola Moss, a K-Mart department manager, testified that at the time of the accident, she was the manager in the ladies wear department. As the department manager, she does not have the responsibility to train employees in regard to clean-up procedures. If there is a spill, the employee is not required to tell a manager if the employee can clean it up, unless someone is needed to watch the area. There is no requirement to inspect for spills. On the day in question, she walked the area just before the accident and saw no green substances on the floor. She saw Mrs. Lousteau fall on some green ice cream, which she believed was dropped by two children walking in front of Mrs. Lousteau. She saw the ice cream fall from the cone, and saw Mrs. Lousteau, right behind the children, step on it. She was about a foot away. A customer, whom Mrs. Moss believed was a nurse, came over to help. The store manager, Mr. Smith, came over and began to speak with Mrs. Lousteau. Mrs. Moss did not see any other type of green substance on the floor.
Ms. Sandra Freeman is employed at the K-Mart, and at the time of the accident was a Human Resource assistant. Her job included training new associates, doing paper work on accident reports, and logging daily attendance. She generated a list of employees on duty on the day of the accident. Mrs. Moss' name was not on the list, nor was Mr. Smith's. Ms. Freeman testified that she overlooked Mr. Smith's name, because mangers don't have time cards. By looking at the time cards, Ms. Freeman also ascertained that Mrs. Moss was also there that day. She did not type the list up, but Mrs. Moss was on her original handwritten list. She could not explain the discrepancies.
Jabbar Smith testified that he is currently an assistant store manager at Vanity Fair Factory Outlet in Arcadia, Louisiana. He was a manager at K-Mart from January 1997 through September of 2000. Prior to leaving K-Mart, he had no disciplinary actions on his record, and in his evaluations, he either met or exceeded expectations. The Veterans store is one of the highest volume stores in the corporation. The accident with Mrs. Lousteau occurred in the aisle that dissects the ladies department, which is not the main aisle. When Mr. Smith arrived at the scene, Mrs. Lousteau seemed to be in a lot of pain, and the paramedics were trying to straighten her leg in order to splint it. Because he was a registered EMT, Mr. Smith was asked to assist them. On the ground nearby, he saw a green substance with streak marks. It appeared to be something solid, caked on and was perhaps grass, rather than a liquid substance. It *622 was stuck, rather than smeared, on the floor, and would have fit inside of the onefoot square floor tiles. In his opinion, the substance was on the floor "for a bit of time, for it to be caked on those floors. Substances don't adhere to those floors very well, because they are waxed. So it had to be there for a period of time." He did not remember seeing any security or loss personnel at the scene. He was shown page three of the accident report form, and stated that he did not write the information thereon, which consisted of his name, the date, and the claim number. Mr. Smith is sure that he completed a page 3 with all of the required information, but the one attached to the report in evidence was not it. On page 2 of the report, Mrs. Moss' name does not appear as a witness, rather two other names were written. Mr. Smith did not recall telling an associate at the defendant's law firm that Mrs. Moss was present at the time of the accident, although it is possible he spoke to the attorney.
The store's safety policies were "pretty much half-assed", there was never any longevity to any particular policy. There was no focus on safety unless there was an incident. There were five minute meetings which were supposed to be held every morning prior to opening, which would sometimes be held for a few days, and sometimes not. There were no regularly scheduled store inspections. The general policy of the store, to clean up a spill if it is seen, was not regularly followed as some employees would pass a spill, and ignore it, while others were more conscientious. At the store in question, he saw spills left on the floor about a halfdozen times. On the day of the accident, he was sure that he had been in the ladies department at one time or another, and if he had seen the spill, he would have had someone clean it up.
Mr. Smith testified that he did not think the substance he saw on the floor came from the customer herself, but acknowledged that his written statement described a "green/black streak, unknown if from customer."
On cross-examination, Mrs. Moss was certain that the incident occurred with Mrs. Lousteau, and not with another person. If there is any lettuce in the store, it would have been sold in the Eatery, as with a hamburger, and she has never seen anyone walk around with a hamburger in the store. Mr. Smith was mistaken as to where the accident happened. Mrs. Moss had seen the area minutes before Mrs. Lousteau fell, and there was nothing there.
The deposition of Dr. Juliette Liss was admitted into evidence. Dr. Liss testified that after Mrs. Lousteau fell, she went to her assistance, and Mrs. Lousteau stated she must have slipped on something. Dr. Liss noticed a dark green smear on the floor very close, within inches, to Mrs. Lousteau's foot, and it looked as though it had been there for a while. The smear "... looked like ... reminded me of when you cut your ... your grass and you have that dark green grass on your lawn mower.... it looks like that [sic] had been stuck to the floor." The smear appeared dry, was about three or four inches long, and it appeared as though Mrs. Lousteau had skidded on it when she walked. The assistant manager came over and noticed the substance on the floor, and commented that Mrs. Lousteau must have slipped on it.
In its Reasons for Judgment, the trial court found that the fall was caused by a foreign green substance which had been adhered to the floor for an extended period of time.
The witnesses who were the most credible testified that this substance was not ice cream and appeared to be plant-like *623 in nature. They further testified that it had obviously been stuck to the floor for some time prior to Mrs. Lousteau's fall. (Reasons for Judgment)
Because the testimony indicated that K-Mart had no established safety procedures in regard to clean up of spills, the court determined that it was more likely than not that the substance which caused Mrs. Lousteau to fall had gone unnoticed by K-Mart or if noticed, was ignored.
Given that this area was adjacent to a food service area inside the store, there was a likelihood of spillage in the area which should have been closely monitored by the defendant. Such a condition as that which existed on the floor presented an unreasonable risk of harm which was clearly foreseeable. The defendant, K-Mart, should have had constructive or actual knowledge of this hazardous condition by virtue of the length of time the substance was present on the floor. The defendant also failed to have any type of written or established safety policies in place which addressed spillage or cleanup of such conditions. As a result of these conclusions, this Court finds the defendant, K-Mart, negligent and therefore liable for the injuries sustained by the plaintiff. The plaintiff, in no way, contributed to her injuries. (Reasons for Judgment)
The applicable statute is La. R.S. 9:2800.6, which declares that a merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage. Under the statute, a plaintiff has the burden of proving, in addition to all other elements of his cause of action, that the condition presented an unreasonable risk of harm, that the risk of harm was reasonably foreseeable, and that the merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence. "Constructive notice" means that the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care.
On appeal, K-Mart does not dispute that Mrs. Lousteau slipped on the substance, but rather argues that she failed to prove the temporal element of R.S. 9:2800.6, in that there was no evidence of how long the material had been on the floor. K-Mart urges that the court unreasonably discredited Ms. Moss's testimony that the spill had occurred moments before Mrs. Lousteau slipped; coupled with the testimony of other K-Mart employees regarding safety policies, K-Mart urges there was sufficient evidence to absolve it of liability.
On the "temporal element issue," our Supreme Court has stated:
The statute does not allow for the inference of constructive notice absent some showing of this temporal element. The claimant must make a positive showing of the existence of the condition prior to the fall.....
Though there is no bright line time period, a claimant must show that "the condition existed for such a period of time ..." Whether the period of time is sufficiently lengthy that a merchant should have discovered the condition is necessarily a fact question; however, there remains the prerequisite showing of some time period. A claimant who simply shows that the condition existed without an additional showing that the condition existed for some time before the fall has not carried the burden of proving constructive notice as mandated by the statute. Though the time period need not be specific in minutes or hours, *624 constructive notice requires that the claimant prove the condition existed for some time period prior to the fall.[2]
Our courts have interpreted White in cases where, like the present matter, a plaintiff is unable to produce a specific timetable relative to the period of time a foreign substance has been present prior to a slip and fall.
It is not necessary for a plaintiff to produce direct evidence to establish that a substance was on the floor for any length of time prior to the accident. If a reasonable inference can be drawn from the circumstantial evidence presented by the plaintiff that it was more probable than not the spill existed for some period of time prior to the accident, the court can conclude the store had constructive notice. It can be inferred from the totality of the circumstances that a foreign substance was on the floor for a sufficient amount of time that it would have been discovered had Wal-Mart exercised reasonable care.[3]
In the above case, the plaintiff slipped in spilled dishwashing detergent and fell in a Wal-Mart store, but was unable to produce any direct evidence to establish that the substance on the floor was there for any length of time prior to the accident. The court found from the circumstantial evidence the plaintiff presented that it was more probable than not that the spill existed for some period of time prior to the accident. In a similar case, plaintiff and another witness testified that store employees were in the general area where a spill was situated, and there was evidence of a spot of the substance on the plaintiff's pant leg after the fall. The manager on duty on the date of the accident testified that he saw the spilled substance on the floor after the accident, and was not sure when that area was last zoned by an employee.[4] This circumstantial evidence was sufficient to fulfill the statutory requirements. This court has also found certain testimony, that a french fry was on the floor and that the area around it had become black, satisfied a plaintiff's burden under White of offering some evidence that the hazardous condition existed for some time before the accident.[5] The Fourth Circuit has found the evidence to be sufficient where a plaintiff testified that the banana on which she slipped was dirtylooking, and a store employee who was summoned when Ms. Lacy fell, testified that there were two pieces of banana on the floor. One piece of banana, which was found where plaintiff said it was, looked as if someone had slid across it. A second piece of banana was found in another aisle, several feet away from where the plaintiff slipped, and was described as being offwhite, similar in color to the floor. Thus, the court determined that plaintiff produced positive evidence from which the jury could have inferred that the banana had been on the floor long enough to become dirty and to have been kicked from one aisle to another by customers.[6]
*625 We find that in the present case, the testimony of Mrs. Lousteau, Mr. Smith and Dr. Liss that the substance was dark green, smeared, and stuck to the floor, supported the finding of the trial court that the material was a foreign green substance which had adhered to the floor for an extended period of time. It is clear that K-Mart had no written or established safety policies in place which addressed spillage or cleanup of such conditions, or established safety procedures in regard to clean up of spills, and as the trial court found, there was a likelihood of spillage in the area which should have been closely monitored. In considering this evidence, we emphasize that the determination of the court to accept or reject evidence, and to assess credibility, is an exercise of discretion,[7] and the record discloses no abuse of that discretion.
Based on the circumstantial evidence, we see no error in the determination that such a condition presented an unreasonable risk of harm which was clearly foreseeable, and that K-Mart had constructive or actual knowledge of this hazardous condition. Accordingly, we affirm the finding of the trial court that K-Mart was liable for the injuries to Mrs. Lousteau.
K-Mart also urges an abuse of discretion in the amount of general damages awarded to Mrs. Lousteau, including damages granted in connection with her knee. K-mart urges that there was a lack of evidence that Mrs. Lousteau's knee problems were causally related to the accident.
Mrs. Lousteau testified that prior to her fall, she lived in her own home and was very active. Thirteen years prior to trial, she had suffered a slip and fall in which she had fractured her left hip and shoulder. She had surgery on her hip at that time, and walked with a slight limp afterwards. Nevertheless, at the time of the K-Mart accident she belonged to several organizations, including a camping club, a card group, and a homemaker's club. She was a gardener, had painted her house, babysat with her grandchildren, and did fitness walking. She attended Mass daily. On holidays, her brother with special needs would stay with her and she helped care for him. When she fell, she was in severe pain. She had broken her leg, and when the paramedics straightened it she screamed with pain. Paramedics performed a closed reduction procedure, straightening the broken leg, without anesthesia. The emergency room treatment was extremely difficult, and she was in the hospital for two and one-half weeks. She had to undergo physical rehabilitation at that time, and after she was discharged, she required a nurse at home three days a week to help her bathe, as well as a physical therapist, and a nurse checked her weekly. She wore a leg brace for three or four months, and also used a walker, but friends had to help her with food. Later, she used a cane for nearly one year, and still uses one if she has to walk for long distances. The shots given her by her doctor helped for a while. Even after her arthroscopy, she continued to suffer with pain. Mrs. Lousteau has a scar from her knee to her hip. She still goes to the homemaker's club, but does not cook very much anymore. She does not participate in the camping club, does not paint around her home, and cannot walk in the mall with her friends. She does not want to swim in the pool because she is embarrassed to wear a swimsuit with her leg scar. She continues to have pain after walking. She *626 moved out of her home because she couldn't keep up with the maintenance, and is unable to take her brother home anymore.
Dr. David Jones first treated Mrs. Lousteau in the emergency room. At that time, she suffered from a comminuted and spiral fracture of the distal femur, the thigh bone. Due to the number of bone fragments, it was considered a severe displaced fracture. This is a very painful injury. The fracture tears muscle and tendon attachments around the bone. Mrs. Lousteau had a pre-existing hip prosthesis, but this break did not involve that device. During the course of treatment, surgery, an open reduction and internal fixation, was performed. A distal condylar screw plate was placed in the leg. The plate has seven screws affixed to the bone. Mrs. Lousteau did complain of knee pain, but it was difficult to differentiate the knee from just above the knee, with that type of fracture. Mrs. Lousteau was in the hospital from May 2, 1999-May 19, 1999. She was in the skilled nursing unit for thirteen days, to receive physical therapy. When she was discharged, she was not to put weight on that bone, making it difficult to care for herself. She continued with physical therapy. On her follow-up visit she still suffered pain at the fracture site, and complained that it hurt to bend her knee. While she had a limited range of motion, there was no evidence of nerve damage. She took medication for pain as needed. In June, 1999, Mrs. Lousteau was doing well, her range of motion and strength improved. In July, the wounds were completely healed, she continued to improve, and she progressed to weight bearing as tolerated. In August, she still had difficulty walking and had a significant limp because of pain in her left knee.
In March 2000 her knee still hurt, and she received injections with a steroid and anesthetic solution to relieve pain. While obtaining some relief, her knee swelled, her pain persisted, and she experienced some instability in that area. In June, 2000, diagnostic arthroscopic surgery was performed. This was necessary to relieve her symptoms. She had degenerative arthritic changes in her knee, not all of which pre-existed before the accident. She was given more pain medication and rehabilitation. Her prognosis for recovery from the broken bone was very good, but on her left knee only fair. In October, 2000, she had continued pain and swelling with prolonged walking, and was diagnosed as having post-traumatic degenerative arthritis in that knee, related to her accident. In May, 2001, she began to receive more injections, but by October of that year returned with the same problems of pain and swelling. Conservative treatment was recommended, with a possible knee replacement in the future. She is able to do whatever pain and leg strength will allow, and will have difficulty walking long distances, on stairs, and possibly even with simple activities. Her prognosis is fair, and Dr. Jones believed she would need at least one more surgery on her knee.
Even given the fact of Mrs. Lousteau's surgery thirteen years earlier, Dr. Jones could not say the degenerative changes in her knee would have developed regardless of the K-Mart accident. It is probable that the changes were the result of both, but because she had no significant complaints before, the doctor found a direct causative relationship to the K-Mart accident. It was more probable than not that the fall exacerbated her knee condition.
Dr. Robert Ryan was Mrs. Lousteau's family physician. Prior to the accident, Mrs. Lousteau was in good health and was very active, with no chronic complaints of pain. Her blood pressure was generally *627 within the acceptable range, and did not need to be treated. After the accident, her pressure was still labile, for which she was given a mild hypertensive, and she had some arthritic complaints. She had significantly reduced activity, and Dr. Ryan felt the injury, a fractured femur which is a major injury, was a stressor and a contributing factor to her general decline in health. Six months prior to the accident, Mrs. Lousteau had revealed that she had a significant amount of stress due to the recent death of her husband, and because of the illness of her son. She also had a tumor on a parotid gland removed, and the stress caused by this was more emotional than physical. Her blood pressure and headaches were probably related to her anxiety problems and stress.
In its Reasons for Judgment, the trial court found that the testimony and evidence clearly indicated that Mrs. Lousteau suffered a severe and debilitating injury as a result of her slip and fall, and awarded the following damages:

Past Pain and Suffering $300,000.00
Future Pain and Suffering $250,000.00
Permanent Disability, Scarring and Disfigurement $ 75,000.00
Loss of Enjoyment of Life $100,000.00
Past Medical Expenses $ 52,843.89
Future Medical Expenses $ 25,000.00
Total $802,843.89

A plaintiff in a personal injury lawsuit proves causation by a preponderance of the evidence. The plaintiff is aided in this endeavor by the legal presumption that a medical condition producing a disability resulted from a preceding accident if: (1) the injured person was in good health prior to the accident; (2) the disabling condition manifested itself shortly after the accident; and, (3) medical evidence indicates that there is a reasonable possibility of a causal connection between the accident and the disabling condition.[8] As we understand Dr. Jones' testimony, it was difficult to distinguish any knee injury because of the extent of the fractured femur, although there was tenderness to the area at the time of the injury. Mrs. Lousteau continued to complain of problems with her knee throughout the course of her treatment with Dr. Jones. Considering the finding by Dr. Jones that the accident more probably than not exacerbated her pre-existing knee condition, we find that Mrs. Lousteau sufficiently proved a relationship between the accident and her knee problems, including the arthroscopic surgery.
Louisiana jurisprudence makes clear that, in the absence of manifest error, the amount of damages awarded by a trial court must not be disturbed. "The assessment of quantum or the appropriate amount of damages by a trial judge or jury is a determination of fact, one entitled to great deference on review."....."[R]easonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award."[9]
*628 Our review, therefore, is strictly limited to whether the amount of damages awarded by the trial judge to this particular plaintiff is reasonable given the specific circumstances of this case. Under this state's jurisprudence, the term "general damages" refers to that category of damages which may not be fixed with any degree of pecuniary exactitude, but which involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured definitively in terms of money.[10] In reviewing an award of general damages, a court of appeal is required to focus on the total award and not on each individual item.[11] Loss of enjoyment of life is a separate element of compensable general damages which must be determined by the trial judge and which is not necessarily included in an award for general pain and suffering.[12]
In the instant case, general damages for pain and suffering, scarring, disfigurement, disability, and loss of enjoyment of life totaled $725,000.00.
We recognize from the testimony and medical evidence presented that Mrs. Lousteau initially suffered greatly as a result of her accident, sustaining a fractured femur that required an operation, leaving her with a metal plate with several screws attached to the bone. The record shows that the initial injury and emergency treatment was "excruciating," and Mrs. Lousteau was hospitalized for two weeks following her first surgery. She continued to receive home health care for some weeks afterwards, and needed personal assistance. She later underwent arthroscopic knee surgery, with limited success.
However, while she continues to suffer pain, at the time of trial, Mrs. Lousteau was taking over-the counter ibuprofen to control it. The medical evidence confirms that a significant portion of her ongoing knee problem, her major ongoing complaint, is due to pre-existing degenerative arthritis. She is able to walk without a cane, unless she is traveling a long distance. There were several bases for her increase in blood pressure unrelated to the accident. The medical evidence suggests that other physical and emotional problems have caused stress and contributed to her decline and well-being. Mrs. Lousteau has, however, experienced a diminution in her lifestyle and level of activities. Due no doubt to her strength of character, it appears that she has made a reasonable recovery enabling her to engage in many of the same activities that she used to, albeit at a reduced level of participation.
Considering all the relevant factors and evidence presented at trial, and the impact of this accident on this particular plaintiff, we find that an award of $750,000.00 for general damages is excessive under the specific circumstances of this case and is an abuse of discretion. Having found this abuse of discretion, we are called upon to analyze awards in similar cases to determine the highest or lowest point which is reasonably within that discretion.[13]
The Fourth Circuit considered a case in which a fifty-four year-old plaintiff suffered a shattered femur requiring two surgeries, and determined that an award of *629 $100,000.00 was unreasonably low.[14] The court analyzed comparable cases, and determined that $300,000.00 was the lowest amount reasonably within the trial court's discretion. Included in this analysis was a case from this circuit, wherein our court affirmed an award of $375,000.00 in general damages, including mental suffering, for a shattered femur, wherein the plaintiff was hospitalized for 17 days and bedridden for several months. She needed a cane to walk, lurched when she did so, suffered severe pain, and possibly required two to three further surgeries.[15] She has a permanent one-inch leg-length discrepancy and was obliged to wear a customdesigned built-up shoe. Although Mrs. Lousteau's injuries are not quite so severe, we find the case sufficiently analogous and hold that $375,000.00 was the highest amount within the trial court's discretion. Factoring in the damages awarded for permanent scarring and disfigurement, the total general damage award is $450,000.00.
K-Mart also urges that there was no basis for the award of future medical expenses. We disagree. Dr. Jones opined that Mrs. Lousteau's prognosis was only fair, that her knee would probably not improve on its own, and she would continue to have to see him on an as needed basis. He believed she would need surgery when she could no longer stand the pain.
Like any other element of special damages, future medical cost or expenses must be established with some degree of certainty, and a plaintiff must demonstrate that such expenditures more probably than not will be incurred as a result of the injury.[16] Awards will not be made for future medical expenses which may or may not occur, in the absence of medical testimony that the expenses for necessary treatment are indicated and setting out their probable cost.[17] The cost for the previous arthroscopic surgery was $20,000.00. The cost for a total knee replacement was approximately $36,000.00. In the present case, Mrs. Lousteau proved the necessary degree of certainty of future treatment, and the amount awarded by the trial court, $25,000.00, was well within its discretion.
For the foregoing reasons, the judgment on appeal is amended to reflect the following damages:

General Damages......................$475,000.00
Past Medical Expenses................$ 52,843.89
Future Medical Expenses..............$ 25,000.00
Total................................$552,843.89

In all other respects, the judgment is affirmed. K-Mart is taxed costs of this appeal.
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] Bourgeois v. Kost, 02-2785 (La.5/20/03), 846 So.2d 692.
[2] White v. Wal-Mart Stores, Inc., 97-0393 (La.9/9/97), 699 So.2d 1081.
[3] Broussard v. Wal-Mart Stores, Inc., 98-813 (La.App. 3 Cir.1/20/99); 741 So.2d 65, writ denied, 99-0486 (La.4/1/99), 742 So.2d 562.
[4] Ceasar v. Wal-Mart Stores, Inc., 00-1181 (La.App. 3 Cir.6/6/01), 787 So.2d 582, writ denied, 01-1899 (La.10/26/01), 799 So.2d 1143.
[5] Beninate v. Wal-Mart Stores, 97-802 (La. App. 5 Cir.12/10/97), 704 So.2d 851, writ denied, 98-82 (La.3/13/98); 713 So.2d 470.
[6] Lacy v. ABC Ins. Co., XXXX-XXXX (La.App. 4 Cir.4/1/98), 712 So.2d 189. See also Davis v. M & E Food Mart, Inc., XXXX-XXXX (La.App. 3 Cir.2002), 829 So.2d 1194; Davenport v. Albertson's, Inc., XXXX-XXXXX (La.App. 3 Cir.12/6/00), 774 So.2d 340, writ denied 01-73 (La.3/23/01), 788 So.2d 427; Zagar v. WalMart Stores, Inc., 1999-362 (La.App. 3 Cir.6/2/99), 747 So.2d 586, writ denied XXXX-XXXX (La.9/3/99), 747 So.2d 548.
[7] Irsch v. Argonaut Great Cent. Ins. Co., 02-988 (La.App. 5 Cir.1/28/03), 841 So.2d 831.
[8] Farrell v. Pierre, 02-1136 (La.App. 5 Cir.4/8/03), 846 So.2d 49.
[9] Caruso v. Canal Indem. Co., 03-423 (La.App. 5 Cir.9/16/03), 858 So.2d 31, citations omitted.
[10] Corbello v. Iowa Production, XXXX-XXXX (La.2/25/03), 850 So.2d 686.
[11] Stevenson v. Louisiana Patient's Compensation Fund, 97-709 (La.App. 5 Cir.4/9/98), 710 So.2d 1178.
[12] Id.
[13] Coco v. Winston Indust. Inc., 341 So.2d 332 (La.1976).
[14] Lederer v. Famous Entertainment, Inc., 1998-2274 (La.App. 4 Cir.5/12/99), 732 So.2d 1277, writ denied XXXX-XXXX (La.9/24/99), 747 So.2d 1123.
[15] Romaguera v. Piccadilly Cafeterias, Inc., 94-374 (La.App. 5 Cir.12/14/94), 648 So.2d 1000, writs denied 95-0093 and 95-0124 (La.3/10/95), 650 So.2d 1183-84.
[16] Mendoza v. Mashburn, 99-499, 99-500 (La. App. 5 Cir.11/10/99), 747 So.2d 1159, 1164, writ not considered, 00-0040 (La.2/18/00), 754 So.2d 957, writ denied, 00-0037 (La.2/18/00), 754 So.2d 976.
[17] Id.