900 So.2d 55 (2005)
Jeanne Noel POCHE and Francis J. Poche
v.
ALLSTATE INSURANCE COMPANY, Jan Corpora and United Services Automobile Association.
No. 04-CA-1058.
Court of Appeal of Louisiana, Fifth Circuit.
March 1, 2005.
*57 Wayne M. Leblanc, Metairie, LA, for Plaintiff/Appellee.
Timothy G. Schafer, New Orleans, LA, for Defendant/Appellant.
Panel composed of Judges JAMES L. CANNELLA, CLARENCE E. McMANUS, and WALTER J. ROTHSCHILD.
JAMES L. CANNELLA, Judge.
The Defendant, United Services Automobile Association (USAA), and the Plaintiffs, Jeanne Poche[1] and Francis Poche, appeal from a personal injury judgment and a subsequent judgment setting costs. We affirm.
Jeanne Poche, a 21 year old student, injured her left shoulder and neck in an automobile accident on July 3, 1995, when a car she was driving was struck by a car driven by Defendant, Jan Corpora (Corpora). The car driven by Jeanne Poche was owned by her father, Francis Poche. On June 3, 1996, the Plaintiffs filed suit against Corpora and her insurer, Allstate Insurance Company (Allstate), and USAA, Francis Poche's uninsured/underinsured motorist carrier.[2]
In August of 1998, Corpora and Allstate were dismissed from the suit, following a settlement for policy limits of $25,000, plus interest. A jury trial was held on February 4 and 5, 2002. The jury returned a verdict in favor of Jeanne Poche in the amount of $20,000 for past pain and suffering and $6,400 (out of a total of $38,454.66) in medical expenses. The award totaled $26,400. The jury did not award any damages for mental anguish, permanent physical impairment or loss of enjoyment of life. The jury verdict was reduced to judgment, which included credits for the settlement amount of $25,000 plus interest and for $40,000 tendered by USAA prior to trial. The Plaintiff filed a motion for JNOV or New Trial. The new trial was granted on October 21, 2002. Supervisory writs were taken by USAA, challenging the judgment granting the new trial. Writs were denied both by this Court in January of 2003 and *58 the Louisiana Supreme Court in April of 2003.
Prior to the new jury trial, the Plaintiff filed a notice to take a second deposition of her surgeon, Dr. Felix Savoie, whose first deposition was used in lieu of live testimony. USAA filed for a protective order. Following a hearing, the trial judge denied the protective order, allowing the Plaintiff to take the second video deposition, which would also be used in lieu of live testimony. In January of 2004, both parties filed motions in limine related to Dr. Savoie's deposition. Of relevance here is the Plaintiff's request to insert portions of the first video deposition into the second video deposition. The trial judge granted the Plaintiff's motion over USAA's objection, but ordered the Plaintiff to indicate, for the benefit of the jury, which portions of the first deposition had been inserted.
A second jury trial was held on January 27, 28 and 30, 2004. The jury awarded Plaintiff $35,040 for past physical pain and suffering, $1,480 for future physical pain and suffering, $4,380 for past mental anguish and distress, $1,480 for future mental anguish and distress, $38,454.66 for past medical expenses, $0 for future medical expenses, $14,600 for permanent physical impairment and $22,265 for loss of enjoyment of life. The award totaled $117,699.66. A judgment in conformity with the verdict was rendered on February 5, 2004, which gave the same credits as the first judgment and awarded costs to the Plaintiff, with the amount to be fixed by a subsequent rule. The following day, the Plaintiff filed a Motion to Fix Fees of Experts and Recognize Court Costs requesting a judgment in the full amount of their costs, $25,622.26. The matter was heard on March 22, 2004. On May 19, 2004, the trial judge rendered a judgment in favor of the Plaintiff for costs in the amount of $19,280.91. USAA and the Plaintiff appealed from both judgments.
USAA raises three issues on appeal. It first contends that the trial judge erred in granting the motion for new trial, that he erred in allowing the second deposition to be supplemented with inserts from the first deposition of Dr. Savoie, and that he erred in including loss of enjoyment of life as a separate element of damages.
The Plaintiff appeals the amount of the award for general and special damages, the award for court and exhibit costs and a jury charge related to the use of the word "assume", rather than "presume."
The evidence here shows that the Plaintiff was an athletic 21 year old who enjoyed a normal lifestyle prior to the accident. In the accident she sustained a serious injury to her left shoulder and a cervical strain. She began to suffer from severe headaches related to those injuries. She was seen by Dr. Warren Bourgeois, an orthopedist, from July 5, 1995 through February 23, 1998. According to his deposition testimony (taken prior to the second trial), her initial complaints were pain in the left shoulder and neck, low back pain and bilateral wrist pain. He diagnosed cervical strain and sprain of the acromioclavicular joint (AC), which is located between the clavicle or collar bone and the forward tip of the shoulder blade, right over the tip of the shoulder. A sprain of that joint implies that the ligaments around the joint have been stretched and injured and the cartilaginous disc within the joint was possibly injured.
Dr. Bourgeois referred the Plaintiff to physical therapy, but she continued to have pain and muscle spasm in her neck and began suffering from severe headaches. She continued with the therapy and was given exercises to perform. The doctor also prescribed muscle relaxants, *59 headache medicine and a narcotic pain medication. Physical therapy was discontinued following an episode with a popping in her neck resulting in muscle spasm and left arm discomfort. In the course of her treatment, she continued to have muscle tenderness. She also exhibited indications of an impingement in the left shoulder, a symptom of rotator cuff tendonitis and had persistent discomfort associated with the injury to the AC joint. Dr. Bourgeois described the rotator cuff as a group of four relatively small muscles and their tendons that hold the joint ball centered in the joint socket during activity. Impingement implies that the rotator cuff is being irritated by rubbing on the undersurface of the acromion, causing inflammation in the rotator cuff and bursa that lie between the cuff and acromion when the arm is brought up into areas of overhead range of motion.
Dr. Bourgeois injected the area between the Plaintiff's shoulder joint and subacromial bursa in November of 1995 and January of 1996 in an attempt to reduce the inflammation. He recommended continued stretching exercises. In November or December of 1995, Dr. Bourgeois referred the Plaintiff to Dr. Donald Adams, a neurologist, for her persistent headaches. Dr. Adams reported that she had a negative Electromyography (EMG), but that the headaches were consistent with muscle contraction. Since her condition did not improve over the next months, the doctor ordered a Magnetic Resonance Imaging (MRI) in July of 1996, which indicated an impingement, but no rotator cuff tear.
In August of 1996, Dr. Bourgeois performed arthroscopic surgery on the left shoulder during which he first probed the area from the front and back and pulled the structures within to determine their integrity. He did not find any tears or abnormality of the soft cartilage ring around the joint socket. The doctor next inserted the probe into the bursa area. In that area he found a problem requiring him to perform a decompression to give the rotator cuff room to move without being rubbed. He did this by shaving off some bone. He also debrided the AC joint which showed post-traumatic inflammation due to the injury.
The Plaintiff improved to some extent after the procedure, but still had pain at the end of each day. Dr. Bourgeois recommended light exercises, including swimming. For one week post-surgery, the Plaintiff used a sling and then exercised according to her pain tolerance level. However, it was necessary to inject her shoulder again in September and November of 1996 because of her continued pain. Dr. Bourgeois continued to follow the Plaintiff for pain in her neck and shoulder and for her headaches. In February of 1997, she reported tenderness and increase in pain in the front of her shoulder after hitting the back of her left shoulder on a car door three weeks prior to the visit. At this point, her medications had changed and she was moving away from the narcotic pain medications and muscle relaxants. By December of 1997, he found symptomatic instability in the shoulder that he felt was causing her worsening symptoms. Her last visit for treatment purposes for these conditions was on February 23, 1998, after she began seeing Dr. Savoie. In 1998, during Dr. Savoie's treatment, he discovered a tear in the rotator cuff. Dr. Bourgeois testified that, although he did not see one during the arthroscopic surgery, it could have been there in 1996 or developed following the surgery.
In December of 2001, in preparation for trial, Dr. Bourgeois was asked to again examine the Plaintiff. Her range of motion had slightly decreased in the left shoulder due to the procedure performed by Dr. Savoie in 1998. Dr. Bourgeois *60 found that the Plaintiff still had bilateral capsular laxity in front and back and still had mild discomfort, although she said that her pain was better after the last operation. However, he noted that she had chronic, but not daily, pain in her neck with activity and that physical and psychological stress aggravated her neck pain. Dr. Bourgeois took x-rays which showed a new condition, a reversal of the normal cervical curvature in the C3-4 level, indicating chronic injury to that disc. He stated that the Plaintiff is more likely going to develop a degenerative disc and arthritis at that level. Dr. Bourgeois stated that this condition has developed since the accident, but was related to it. He thought that there had been a subtle injury to the disc in the accident. He stated that these types of things progress slowly, which explains why it was not obvious on the early x-rays and MRI.[3] He further noted that she was seeing Dr. Maria Palmer for her continuing headaches. Dr. Bourgeois testified that he believed that the Plaintiff had been as compliant as possible with his instructions for exercises and physical therapy during his treatment of her.
In January of 1998, the Plaintiff sought the services of Dr. Savoie, a noted shoulder specialist, located in Jackson, Mississippi. When he first saw her, she could not use the left arm because it was functionally impaired. Dr. Savoie noted that the Plaintiff is naturally loose jointed and that people with this condition, called multi-directional, can have the condition without problems until lack of exercise or a bruise to the rotator cuff causes the muscles to slip. This puts stress across the rotator cuff, which in turn produces pain. Dr. Savoie related the Plaintiff's pain from the slippage to the accident. He prescribed exercises and eventually performed the Plaintiff's second arthroscopic surgery in March of 1998 to reconstruct, or tighten, her left shoulder joint capsule. In the first deposition, he stated that he did not see a rotator cuff tear, but did see some changes in the rotator interval area that was due to an injury of some kind. In the second deposition, Dr. Savoie stated that during this surgery, he noticed a large diagonal tear or rent in the capsule. He noted that the tear would not necessarily show up on diagnostic tests. He stated it was a traumatic tear. Based on a description of the impact in the accident, he felt the accident could have caused it.
Dr. Savoie also prescribed an ice water pump to ice the shoulder for the next three months. Four to six weeks after the surgery, she began physical therapy. He felt that she was complying with her therapy. Dr. Savoie gave the Plaintiff permission to travel two months after the surgery to Mexico and England for school pursuits because she was doing well. However, he warned her to not jerk the shoulder or do anything traumatic to the shoulder. The Plaintiff attended 25 sessions at Access Rehab, which helped improve her condition. Dr. Savoie saw the Plaintiff in December of 1998, after she finished the 25 physical therapy rehabilitation sessions. After physical therapy, Dr. Savoie assigned the Plaintiff 8% impairment to her left shoulder, 5% impairment to her whole body, and stated that her shoulder lacked 10% of normal motion. The shoulder also has crepitation or grinding, probably from the internal stitches. The doctor recommends that she perform home exercises for ten minutes, three days a week.
*61 Dr. Savoie noted that the muscles of multi-directional people like the Plaintiff tend to loosen more over time. Although a traumatic tear would heal, the shoulder muscles may get looser. However, he noted that as a person ages, the muscles stiffen. This can happen even with multidirectional patients. Thus, he is hopeful that with aging and exercises, the Plaintiff's muscles will stiffen and the pain from the muscle laxity will end. Otherwise, Dr. Savoie stated that she has a one in ten chance of needing future surgery to correct looseness in that shoulder. Dr. Savoie noted that he saw her again in May of 1999 due to a flare-up of the pain in her shoulder caused from it getting a little out of balance.
In regard to the incident in which the Plaintiff hit the back of her shoulder on a car door, Dr. Savoie testified that it might have slightly aggravated her condition, but he would not ascribe that event as a cause to her symptoms. He noted she was not pain free after the first surgery. Had she been pain free, then he might focus on the second event as a causative factor.
The evidence further shows that the Plaintiff's lifestyle activities have been impacted. Prior to the accident, she was active in many sports, including golf, softball and cabbage ball. The Plaintiff is continuing to go about her life as best as she can, but misses the ability to enjoy her prior activities to the extent she was able to do prior to the accident.

APPEAL BY USAA

A) Motion for New Trial
USAA contends that the trial judge erred in basing his decision to grant the new trial on legal error due to the jury's violation of the collateral source rule, and that the fair interpretation of the evidence mandated a higher award. USAA previously raised this issue after the granting of the new trial. We denied USAA's writ application, stating:
On the showing made, we find no abuse of the trial judge's discretion. A motion for new trial requires a less stringent test than a JNOV, because such a determination involves only a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury. Martin v. Heritage Manor South, 00-1023, p. 4 (La.4/3/01), 784 So.2d 627, 631. In considering whether the verdict was supported by any "fair interpretation of the evidence" on a motion for new trial, the trial judge is free to weigh the evidence and make credibility determinations, and is not required to view the evidence in the light most favorable to the non-movant as on a motion for JNOV. Martin, 00-1024[00-1023] at p. 5, 784 So.2d at 631.
Poche v. Allstate Ins. Co., 02-C-1138 (La. App. 5th Cir.1/27/03); writ denied, 03-0581 (La.4/25/03), 842 So.2d 410.
Although USAA contends that we should not follow our prior disposition because we did not have the benefit of the trial evidence, the writ applicant is responsible for providing documents or testimony that supports its position. Since there has been a trial and USAA was provided an opportunity to present its case for a second time, we find this decision to be law of the case, and find no reason to revisit the issue.

2) Deposition Inserts
USAA next asserts that the trial judge erred in allowing the Plaintiff to insert parts of Dr. Savoie's first video deposition into the second video deposition for perpetuation purposes for the second trial. It complains that the doctor changed his testimony on an important issue, even though he had not seen the Plaintiff since his first deposition was taken *62 for the first trial. In particular, USAA contends that the doctor first testified that there was no actual tear in the front of the shoulder capsule (the anterior labrum), only some changes across the rotator interval. In the second deposition, he said that he saw a large diagonal traumatic tear of the capsule in the front of the shoulder joint. USAA argues that the evidence shows that some intervening event caused the tear, as it was not there in the 1996 MRI test taken prior to the first surgery. It assets that the insertion of this portion of the 1999 deposition was designed to confuse the jury, as there was no opportunity to cross-examine the doctor on this discrepancy since it thought that the new deposition was to be used in lieu of the old one.
The Plaintiff argues that the second deposition was taken to cover issues and facts that arose after the first one, which was taken nine months before the first trial. The issues involved whether her college trips to Mexico and London interfered with her rehabilitation, whether she was compliant in rehabilitation, whether it is normal for patients to fall off exercising when those exercises are lifelong requirements, whether her joints are globally lax or the laxity is only in her shoulder, whether swimming exercises described by Dr. Bourgeois or Dr. Palmer would interfere with her healing processes, and whether she had reported low back symptoms during her treatment with Dr. Savoie. The trial judge allowed the second deposition to be taken to address those issues. The Plaintiff asserts that it was not the intention for the second deposition to stand on its own, but was to supplement the first one. The Plaintiff admits that new issues were covered, but asserts that USAA had ample opportunity to ask new questions on cross-examination. In addition, USAA also gave the Plaintiff some inserts to place in the video deposition, but withdrew them because defense counsel did not feel that inserting portions of the first deposition was proper. The Plaintiff notes that the inserts were of the cross-examination by USAA's co-counsel.
The trial judge allowed the inserts, but with the admonition to inform the jury which portions of the video deposition were from which deposition, so they would know that there were two depositions. We have reviewed the depositions and find no prejudice to the Defendant. Any inconsistencies go to the credibility of the witness, which the jury was capable of determining. Consequently, we find that the trial judge did not abuse his discretion in allowing portions of the 1999 deposition of Dr. Savoie to be inserted in his 2003 deposition.

3) Loss of Enjoyment of Life
USAA contends that loss of enjoyment of life should not have been listed on the jury verdict sheet as a separate element of damages. It contends that those damages are encompassed in the award for permanent physical impairment. The jurisprudence in this Circuit, as well as the First, Second and Third Circuit Courts of Appeal, recognize that loss of enjoyment of life is a separate element of compensable general damages which is not necessarily included in an award for general damages. Lousteau v. K-Mart Corp., 03-1182, p. 16 (La.App. 5th Cir., 3/30/04), 871 So.2d 618, 628; Hebert v. Old Republic Ins. Co., 01-355, p. 18 (La.App. 5th Cir.1/29/02), 807 So.2d 1114, 1128; Stevenson v. Louisiana Patient's Compensation Fund, 97-709, p. 6 (La.App. 5th Cir.4/9/98), 710 So.2d 1178, 1182. [See, Matos v. Clarendon Nat. Ins. Co., 00-2814, p. 8 (La.App. 1st Cir.2/15/02), 808 So.2d 841 for a summation of the law in the Circuits through 2002.] Under current law, the Fourth Circuit continues to be the only Circuit holding that it is erroneous to award separate damages for loss *63 of enjoyment of life. The Louisiana Supreme Court has yet to address the issue of awarding hedonic damages for loss of enjoyment of life as a separate element of damages. See: Justice Victory's concurring opinion in Joseph v. Broussard Rice Mill, Inc., 00-628, p. 18 (La.10/30/00); 772 So.2d 94, 107. Based on the jurisprudence from our Circuit in particular and supported by First, Second and Third Circuits, we find that loss of enjoyment of life can be a separate item of general damages.
In regard to whether it is duplicative of the award for permanent physical impairment in this case, we find that it is not. The testimony shows that the Plaintiff was a healthy, athletic, young adult when she was injured. From grammar school on, she played ball, was a gymnast and taught gymnastics. She played volleyball in high school and with a University of New Orleans team. She rode regular and mountain bicycles and played softball when she was a college student. She liked to be outside playing sports with her friends. Her lifting ability has been compromised. Because her physical activities have been curtailed or abandoned due to the injury, she is entitled to an award for permanent physical impairment.
In addition, the loss of enjoyment of life award is also appropriate. She was a young woman who has had to compensate and change her lifestyle drastically. The injury has interfered with her life. Aside from the physical impairment, her medical condition interfered with her college and life activities due to the time and discomfort of undergoing 13 months of conservative medical treatment. She required numerous medications for her neck, shoulder, headaches and anxiety, which require trips to the pharmacist and, in the case of narcotics, dealing with the side effects of medications. She underwent two uncomfortable surgeries. According to the testimony, her condition forced her to become more, rather than less, dependent on her parents as she matured. Her mother testified that the Plaintiff has worried about getting well since the accident. She handles the situation well most times, and not so well at other times. The Plaintiff has to endure the inconvenience and discomfort of consistent exercising to maintain her ability to use her injured arm. In addition, the injury has had an emotional impact from her inability to participate fully in the athletic activities which she previously enjoyed, such as throwing a ball, playing golf with her father, and playing with the youngsters in her family. She also has trouble sleeping at night and cannot sleep on her left side. Based on the facts of this case, we find that the jury did not err in awarding the Plaintiff damages for loss of enjoyment of life in addition to permanent physical impairment.

THE PLAINTIFF'S APPEAL

1) Award for General and Special Damages
The standard for the review of damage awards is whether, after an articulated analysis of the facts, the appellate court finds that the trial judge abused his great discretion. Farrell v. Pierre, 02-1136, p. 9 (La.App. 5th Cir.4/8/03), 846 So.2d 49, 55; Matta, 01-760 at p. 8, 807 So.2d at 939; Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). This determination is made with consideration to the individual circumstances of an injured plaintiff. Farrell, 02-1136 at p. 9, 846 So.2d at 55; Matta, 01-760 at p. 9, 807 So.2d at 939; Theriot, 625 So.2d at 1340. After an analysis of the facts and circumstances peculiar to the particular case and a particular plaintiff, an appellate court may conclude that the award is inadequate (or excessive). Farrell, 02-1136 at p. 9, 846 So.2d at 55; Matta, 01-760 at p. 9, 807 So.2d at 939; Theriot, 625 So.2d at 1340. *64 Only then does the appellate court resort to prior awards, and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Farrell, 02-1136 at p. 9, 846 So.2d at 55; Matta, 01-760 at p. 9, 807 So.2d at 939; Theriot, 625 So.2d at 1340.
The Plaintiff asserts that the jury award is inadequate. We have already stated the facts in this case. Following our review of these particular facts, we find that the jury award is not so low as to be an abuse of its discretion.

2) Costs
The Plaintiff contends that the trial judge erred in not awarding all of her documented costs. The Plaintiff was charged $1,071.10 in court costs, but was given a credit of $148.16. Thus, she actually paid $922.94. However, the trial judge only awarded $605.70. The Plaintiff asserts that she also paid fees to the Secretary of State, the Civil Sheriff and transcript costs for successful writs. Those amounted to $739.70. Thus, she requests to be paid $1,662.64 in court related costs.
The Plaintiff also contends that the trial judge should have awarded her full exhibit costs. She contends that she incurred $1,470 for the electronic presentation that included a projector, screen, VCR, speakers and set up charges. Further, she incurred video tape playback expenses of $135 in the first trial, anatomical trial exhibits of $575, and Kinko's photograph fees of $200. Thus, her total exhibit costs are $2,380.
The trial judge is afforded great discretion in awarding costs and an award of costs must be affirmed in the absence of an abuse of discretion. Scramuzza v. River Oaks, Inc., 04-1088 (La.6/25/04), 876 So.2d 839. In light of the record in this case, we find that the trial judge did not abuse his discretion.

3) Jury Charge
The Plaintiff argues that the trial judge erred in charging the jury on the credibility of the witnesses by using the words "assume" and "assumption," rather than "presume" and "presumption" in Charge 5 of the jury instructions. She also contends that the instruction spends little time with the presumption and then 100 words of why a person should not be believed.
CHARGE 5 states:
You, as jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves. Ordinarily, it is assumed that a witness will speak the truth. But this assumption may be dispelled by the appearance and conduct of the witness, by the manner in which the witness testifies, or by the character of the testimony given or by evidence to the contrary of testimony given.
You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to indicate whether a witness is worthy of belief. Consider each witness' intelligence, motive, state of mind, demeanor and manner while on the stand. Consider also any relationship each witness may bear to either side of the case; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.
In Nicholas v. Allstate Ins. Co., 99-2522, p. 8-9 (La.8/31/00), 765 So.2d 1017, 1023, the Louisiana Court stated:
Louisiana jurisprudence is well established that an appellate court must exercise *65 great restraint before it reverses a jury verdict because of erroneous jury instructions. The basis for this rule of law is that trial courts are given broad discretion in formulating jury instructions and it is well accepted that a trial court judgment will not be reversed so long as the charge correctly states the substance of the law. However, when a jury is erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. In the assessment of an alleged erroneous jury instruction, it is the duty of the reviewing court to assess such impropriety in light of the entire jury charge to determine if they adequately provide the correct principles of law as applied to the issued framed in the pleadings and evidence and whether they adequately guided the jury in its deliberation. Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice.
[Citations omitted]
In this case, we have reviewed the instructions and find that they adequately state the substance of the law and, in light of the jury verdict, did not prejudice the Plaintiff. Thus, we find that the trial judge did not err in giving the particular charge on the credibility of witnesses in this particular case.
Accordingly, the judgment of the trial court is hereby affirmed. Costs of appeal are assessed against USAA.
AFFIRMED.
NOTES
[1] Jeanne Poche has married since the institution of this suit. Her present name is Jeanne Poche Bradford.
[2] Henceforth we will refer only to Jeanne Poche as the Plaintiff.
[3] Dr. Bourgeois also performed low back surgery on the Plaintiff on two later occasions that was unrelated to the accident. The low back symptoms were first reported in October of 2001.